**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 6 1999**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

_____

WILLIAM ADRIAN BUTLER,

    Plaintiff - Appellant,

v.

CITY OF PRAIRIE VILLAGE,
KANSAS; H. MONROE
TALIAFERRO, JR., Mayor;
BARBARA J. VERNON, City
Administrator; CAROL PENDLETON,
Chairman of Policy and Services
Committee; JERALD R. ROBNETT,
former Director of Public Works
Department,

    Defendants - Appellees.

No. 97-3291

_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 96-2045-JWL)**

_____

B. Kay Huff, Lawrence, Kansas, for Plaintiff-Appellant.

Mark D. Katz of Sherman, Taff & Bangert, P.C., Kansas City, Missouri, and
David W. Hauber of Boddington & Brown Chartered, Kansas City, Kansas, for
Defendants-Appellees.

_____

Before **HENRY**, **McKAY**, and **BRISCOE**, Circuit Judges.

_____

**McKAY**, Circuit Judge.

_____

Plaintiff-Appellant William Adrian Butler appeals from a dismissal pursuant to Rule 12(c) of the Federal Rules of Civil Procedure and a grant of summary judgment entered in favor of Defendants-Appellees by the United States District Court for the District of Kansas. Plaintiff was an employee of Defendant City of Prairie Village, Kansas. All of the individual defendants were employed by, or otherwise connected with, the City during the time period relevant to this dispute. Defendant H. Monroe Taliaferro, Jr., was the Mayor; Defendant Barbara J. Vernon was the City Administrator; Defendant Carol Pendelton was a member of the city council and chair of the Policy and Services Committee; and Defendant Jerald R. Robnett was the director of the Public Works Department.

During his employment with the City, Plaintiff testified at an arbitration hearing involving a dispute between the City and one of its contractors, and he reported rumors of employee thefts to his supervisors. After approximately five and one-half years of employment with the City, Plaintiff announced that he suffered from severe clinical depression and requested permission to work only forty hours per week. Pursuant to a reorganization of his department, Plaintiff's employment was terminated on January 27, 1994, approximately one year after

testifying at the arbitration, one to four months after reporting the employee thefts, and seven months after requesting the accommodation to his work schedule. Several months after the reorganization, the City created a new position in Plaintiff's former department. The duties, qualifications, and salary range of the new position were similar to those of Plaintiff's former position.

In this appeal, Plaintiff raises four issues. First, he contends that the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12213, does not preclude personal capacity suits against individual supervisors. Second, Plaintiff claims that the district court should not have entered summary judgment in favor of Defendants on his claims that he was terminated in violation of the First Amendment. Third, he argues that summary judgment was improper on his ADA claim of discrimination because he has raised genuine issues of material fact. Fourth, Plaintiff contends that the district court erroneously entered summary judgment in favor of the defendants on his ADA retaliation claim.

I.

The City hired Plaintiff as an assistant director in its Public Works Department in September 1987. Plaintiff's duties included planning and organizing construction and maintenance of storm drainage systems and open water courses; planning and implementing training programs for employees;

preparing reports; attending city council meetings and coordinating activities with committees and commissions; serving as a liaison between residents, consulting engineers, and contractors; developing, managing, and reporting results of programs for the annual budget; carrying out city and departmental policies; assisting director with preparation of committee agenda; preparing applicable job performance evaluations and related documentation; developing and obtaining cost estimates for construction of city facilities; planning procedures and reporting results of traffic safety control policy and procedures; monitoring communication systems; managing excavation stormwater management permit systems; providing recommendations for street lighting petitions and ensuring that installations and changes conform to policy; developing and completing street light work orders; arranging Kansas Department of Transportation bridge inspections; monitoring use of personal computers and software; obtaining easements; and serving as a liaison for projects involving federal funding. See R., Vol. 5 at 17-19.

During his employment with the City, two incidents occurred which Plaintiff claims are relevant to this dispute. In 1992, a city mechanic told Plaintiff about some disappearing police tires. Plaintiff alleges that he encouraged the mechanic to report the thefts. However, he also alleges that he reported the missing inventory to Mr. Robnett on a number of occasions during

staff meetings in the fall of 1993. Additionally, Plaintiff claims that he told Ms. Vernon about the missing inventory twice during the fall of 1993. Neither Mr. Robnett nor Ms. Vernon recalls Plaintiff telling them about the disappearing inventory.

The second incident occurred in October or November 1992, when Plaintiff testified under oath at an arbitration hearing between the City and one of its contractors. Plaintiff's testimony was not favorable to the City and, in December 1992, the arbitrator granted the contractor a substantial monetary award. At a staff meeting following the arbitration award, several city officials, including Mr. Robnett, Ms. Vernon, and Mayor Taliaferro, expressed their disappointment about the outcome of the arbitration. Mr. Robnett mentioned the outcome of the arbitration to Plaintiff on a later occasion, to which Plaintiff allegedly responded with a dry grin and stated, "Yes, I understand that is the case." Id., Vol. 1, Robnett Dep. at 71-72. Mr. Robnett took Plaintiff's response to mean that Plaintiff was encouraged by the outcome of the arbitration. Apart from this exchange with Mr. Robnett, there is no evidence indicating that any of the individual defendants were aware of the substance of Plaintiff's testimony.

Up until the spring of 1993, Plaintiff's work performance seems to have been satisfactory. In fact, Plaintiff received wage increases in 1991, 1992, and 1993, pursuant to the City's merit-based wage program. Additionally, on

December 23, 1992, Mr. Robnett, who was the director of the Public Works Department at the time, gave Plaintiff a written performance evaluation. The evaluation form contained twenty different categories in which to rate employees. Mr. Robnett rated Plaintiff as "exceeds expectations" in seven categories, as "meets expectations" in five categories, and as "improvement needed" in five categories. Pl.'s App., Vol. I, Doc. 7, Ex. B. The remaining three categories were not applicable to Plaintiff. See id.

In March or April 1993, Plaintiff told Mr. Robnett that he suffered from severe clinical depression. In May 1993, he gave Mr. Robnett a letter from his psychologist, Dr. Lee Forge, which indicated that Plaintiff generally should not work more than forty hours per week because doing so would cause him stress and decrease his productivity. After receiving the letter, Mr. Robnett met with Plaintiff weekly to review his work. He also took on some of Plaintiff's work to ensure its timely completion. After Plaintiff requested a reduced work schedule to accommodate his depression, Mr. Robnett repeatedly told Plaintiff that Mr. Robnett was "drowning in the work assignments" and that Plaintiff was not "holding up his end of what needed to be done." R., Vol. 1, Robnett Dep. at 60. Mr. Robnett also testified that Plaintiff's work performance deteriorated during 1993.

When Mr. Robnett left his position as director of the Department of Public

Works in September 1993, Ms. Vernon became acting director. Shortly after she began working in this capacity, Ms. Vernon met with Plaintiff to discuss his work load. Plaintiff told Ms. Vernon that he had more work than he could successfully complete and asked her to take over some of his contracts because she previously had dealt with those specific contractors. Ms. Vernon agreed to do so.

During Ms. Vernon's tenure, Plaintiff never worked more than forty hours a week. Despite this apparent accommodation, it appears from the record that tension developed between Plaintiff and Ms. Vernon. This tension seems to have resulted, at least in part, from Plaintiff's belief that Ms. Vernon was targeting him by giving him short deadlines, too much work, and too little secretarial assistance. Moreover, Plaintiff allegedly failed to communicate his work activities to Ms. Vernon, which made it difficult for her to monitor his work. Ms. Vernon also questioned whether Plaintiff was spending his time on the work that he had been assigned or on unrelated matters. In addition, Plaintiff allegedly told Ms. Vernon that he did not trust her and began to tape record his meetings with her. Ms. Vernon ultimately determined that Plaintiff was not fulfilling his duties in a timely manner. She attempted to solve the problem by assisting Plaintiff in prioritizing his job duties, but she also assumed certain of Plaintiff's duties herself to ensure their timely completion.

During the fall of 1993, Ms. Vernon started disciplining Plaintiff for his

work habits. On November 30, 1993, she met with Plaintiff and gave him two written performance evaluations, each of which was prepared on the same evaluation form Mr. Robnett had used to evaluate Plaintiff in December 1992. Both evaluations indicated that Plaintiff needed improvement in every category listed on the evaluation form. Mr. Robnett had prepared one of the evaluations, which was dated October 1, 1993; Ms. Vernon had prepared the other evaluation, which was undated. During the November 30 meeting, Plaintiff allegedly made threatening remarks and engaged in threatening conduct toward Ms. Vernon. On December 10, 1993, in response to this conduct, Ms. Vernon gave Plaintiff a disciplinary warning and suspended him for two days without pay. At that time, Plaintiff told Ms. Vernon, "I know why you are doing this now. . . . It's for testifying in that lawsuit which the city ultimately lost." Id., Butler Dep. at 87. Plaintiff claims that Ms. Vernon responded to his remark with laughter, while Ms. Vernon states in her deposition that she felt threatened by Plaintiff.

On December 3, 1993, before Ms. Vernon suspended him, Plaintiff had sent a complaint to Mayor Taliaferro alleging that Ms. Vernon was harassing him and that her management style had established a hostile, intimidating, and offensive work environment. In response, Mayor Taliaferro sent a form entitled "Harassment Investigation" to Plaintiff. On January 18, 1994, Plaintiff submitted a lengthy memorandum to Mayor Taliaferro responding to the questions on the

form. Although the director of personnel was assigned to investigate Plaintiff's complaint, he never interviewed Plaintiff or Ms. Vernon. Mayor Taliaferro ultimately concluded that Plaintiff's claims against Ms. Vernon were groundless.

Approximately one month after Plaintiff submitted his complaint regarding Ms. Vernon to Mayor Taliaferro, Ms. Vernon began contemplating a reorganization of the Public Works Department. She met with several consultants to discuss the reorganization. Additionally, the record indicates that a former assistant director who left his position in September 1993 told Ms. Vernon that he thought his position was unnecessary. On January 18, 1994, Ms. Vernon announced her reorganization plan at a meeting of the city council. Ms. Vernon's plan eliminated the two assistant director positions, even though Plaintiff's position was the only assistant director position which was occupied at that time. The plan also involved hiring a new Public Works Director who could perform many of the necessary functions previously performed by the assistant directors. Of the nine departmental positions eliminated in the five years prior to 1996, Plaintiff's position was the only one that was occupied when it was eliminated.[1] As a consequence of Ms. Vernon's reorganization plan, Plaintiff received a hand-

---

[1]The record reveals that, between 1991 and 1996, seven positions were eliminated and two were reduced from full-time to part-time. See Pl.'s App., Vol. II, Doc. 17 at 6-7. This means that, including the two assistant director positions, a total of nine positions were eliminated during that period.

delivered letter from Ms. Vernon on January 27, 1994, informing him that his position had been eliminated.

Several months after Ms. Vernon's reorganization of the Public Works Department was implemented, a new position entitled "Project Coordinator" was created in the department. The duties of the project coordinator include, but are not limited to, the following: planning and organizing the administration of utility and contract construction; performing administrative duties; interacting with community groups, residents, and other governmental groups; assisting the department director; and organizing projects and preparing special reports. Like the former assistant directors, the project coordinator reports to the Public Works Director.

After Plaintiff was terminated, he filed administrative charges with the Equal Employment Opportunity Commission alleging that the City had discriminated against him in violation of the ADA and the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634. Plaintiff commenced this action in January 1996, and the EEOC issued him a right-to-sue letter on March 13, 1996. The district court dismissed several of Plaintiff's claims pursuant to Defendants' motion under Rule 12(c) of the Federal Rules of Civil Procedure. See Butler v. City of Prairie Village, 961 F. Supp. 1470 (D. Kan. 1997). The same court subsequently entered summary judgment in favor of Defendants on Plaintiff's

remaining claims.  See Butler v. City of Prairie Village, 974 F. Supp. 1386 (D.

Kan. 1997).


II.

Our disposition of Plaintiff's individual liability argument determines

whether the individual defendants named in this action may be held liable for his

ADA discrimination and retaliation claims.  Because the issue of whether

individual supervisors may incur liability under the ADA is a purely legal

question, we review the district court's dismissal of this claim de novo.[2]  See

Haynes v. Williams, 88 F.3d 898, 899 (10th Cir. 1996).

In dismissing Plaintiff's argument that individual supervisors may be held

liable under the ADA, the district court "conclude[d] that the Tenth Circuit would

reject the notion of supervisor liability under the ADA."  Butler, 961 F. Supp. at

1475.  While we have not previously addressed this precise question with respect

to the ADA, we have answered this question in connection with Title VII.  In

1996, this court reiterated its established rule that "personal capacity suits against

individual supervisors are inappropriate under Title VII."  Haynes, 88 F.3d at

901; see also Sauers v. Salt Lake County, 1 F.3d 1122, 1125 (10th Cir. 1993)

_____

[2]We note that the district court dismissed this issue in response to
Defendants' Rule 12(c) motion to dismiss.  See Butler, 961 F. Supp at 1475.

-11-

("Under Title VII, suits against individuals must proceed in their official capacity; individual capacity suits are inappropriate.").

In support of its holding that Title VII precludes individual supervisor liability, the Haynes panel recognized that the "'employment discrimination statutes have broad remedial purposes and should be interpreted liberally, but that cannot trump the narrow, focused conclusion we draw from the structure and logic of the statutes.'" Haynes, 88 F.3d at 901 (quoting EEOC v. AIC Sec. Investigations, Ltd., 55 F.3d 1276, 1282 (7th Cir. 1995)). As the Seventh Circuit explained, "[a] liberal construction does not mean one that flies in the face of the structure of the statute." AIC Sec. Investigations, 55 F.3d at 1282 (holding that individuals who do not otherwise meet the statutory definition of employer cannot be held liable under the ADA). These explanations are equally applicable to the structure and logic of the ADA. While the ADA's remedial purposes are broad and far-reaching, the statute imposes liability only on a specifically defined class of persons. Limiting liability to employers with fifteen or more employees strikes "a balance between the goal of stamping out all discrimination and the goal of protecting small entities from the hardship of litigating discrimination claims." Id. at 1281; see also Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 510 (4th Cir.) ("The purpose of this provision [limiting liability to employers with at least fifteen employees] can only be to reduce the burden of the ADEA on small

businesses."), cert. denied, 513 U.S. 1058 (1994).

The ADA, Title VII, and the ADEA all prohibit discrimination by employers on a variety of grounds.[3] See 42 U.S.C. §§ 12111(2) & 12112 (ADA); id. § 2000e-2(a) (Title VII); 29 U.S.C. § 623(a) (ADEA). Similarly to Title VII and the ADEA, the ADA defines "employer" as "a person engaged in an industry affecting commerce who has 15 or more employees . . . , and any agent of such person." 42 U.S.C. § 12111(5)(A); cf. id. § 2000e(b); 29 U.S.C. § 630(b). Because we can discern no meaningful distinction between the definitions of "employer" in Title VII and the ADA, our reasoning in Haynes dictates the outcome of this case. Cf. Finley v. United States, 82 F.3d 966, 974 (10th Cir. 1996); United States v. Spedalieri, 910 F.2d 707, 709 n.2 (10th Cir. 1990). Accordingly, we now hold that the ADA precludes personal capacity suits against individuals who do not otherwise qualify as employers under the statutory definition. Not only is our position consistent with the majority of federal circuit and district courts that have considered the issue of individual supervisor liability under Title VII and the ADEA, see, e.g., Wathen v. General Elec. Co., 115 F.3d 400, 405 (6th Cir. 1997) (Title VII); Williams v. Banning, 72 F.3d 552, 555 (7th Cir. 1995) (Title VII); Tomka v. Seiler Corp., 66 F.3d 1295, 1314 (2d Cir. 1995)

_____

[3]Each of these acts also prohibits discrimination by employment agencies and labor organizations. See 42 U.S.C. § 12111(2) (ADA); id. § 2000e-2(b)-(d) (Title VII); 29 U.S.C. § 623(b)-(c) (ADEA).

(Title VII); <u>Smith v. Lomax</u>, 45 F.3d 402, 403 n.4 (11th Cir. 1995) (Title VII and ADEA); <u>Birkbeck</u>, 30 F.3d at 511 (ADEA); <u>Grant v. Lone Star Co.</u>, 21 F.3d 649, 653 (5th Cir.) (Title VII), <u>cert. denied</u>, 513 U.S. 1015 (1994); <u>Miller v. Maxwell's Int'l, Inc.</u>, 991 F.2d 583, 587-88 (9th Cir. 1993) (Title VII and ADEA), <u>cert. denied</u> <u>sub nom</u> <u>Miller v. LaRosa</u>, 510 U.S. 1109 (1994), but it is also in accordance with the only circuit courts that have directly addressed the issue of individual liability under the ADA. <u>See</u> <u>Mason v. Stallings</u>, 82 F.3d 1007, 1009 (11th Cir. 1996); <u>AIC Sec. Investigations</u>, 55 F.3d at 1282. As a result of our holding, the individual defendants named in this action may not be held liable for discrimination or retaliation in violation of the ADA.

## III.

The district court disposed of Plaintiff's remaining claims on summary judgment. <u>See</u> <u>Butler</u>, 974 F. Supp. 1408. We review the grant or denial of summary judgment de novo, and we apply the same legal standard employed by the district court pursuant to Federal Rule of Civil Procedure 56(c). <u>See</u> <u>Kaul v. Stephan</u>, 83 F.3d 1208, 1212 (10th Cir. 1996). Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law." Fed. R. Civ. P. 56(c). "'When applying this standard, we examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. If there is no genuine issue of material fact in dispute, then we next determine if the substantive law was correctly applied by the district court.'" Kaul, 83 F.3d at 1212 (quoting Wolf v. Prudential Ins. Co. of Am., 50 F.3d 793, 796 (10th Cir. 1995)).

## A.

In his complaint, Plaintiff alleged that Defendants violated his First Amendment rights by terminating him for reporting employee thefts and for providing truthful testimony at an arbitration hearing involving a dispute between the City and one of its contractors. In response to this claim, the individual defendants asserted the defenses of absolute and qualified immunity. Although the district court was unable to determine in what capacities the individual defendants were operating when the decision to terminate Plaintiff was made, the court noted that it "is highly doubtful that absolute immunity applies to an individual municipal administrator's decision to reorganize her department without approval from a governing body." Butler, 974 F. Supp. at 1397. As a result, the court denied the individual defendants' motion for summary judgment as to absolute immunity. See id. The court then analyzed the question of

-15-

qualified immunity and concluded that the individual defendants were entitled to qualified immunity on Plaintiff's First Amendment claims. See id. at 1397-98. Plaintiff contends that the district court erred in determining that Defendants were entitled to qualified immunity.

The doctrine of qualified immunity shields individual government officials performing discretionary functions "'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Tonkovich v. Kansas Bd. of Regents, 159 F.3d 504, 516 (10th Cir. 1998) (citations omitted); see also Gehl Group v. Koby, 63 F.3d 1528, 1533 (10th Cir. 1995). To analyze this issue, we must first determine "whether the plaintiff has sufficiently alleged that the defendant violated a statutory or constitutional right." Tonkovich, 159 F.3d at 516. If the plaintiff has asserted such a deprivation, only then do we inquire "whether the right was clearly established such that a reasonable person in the defendant's position would have known that his or her conduct violated that right." Id.; see also Koby, 63 F.3d at 1533 ("Where a plaintiff fails to demonstrate that a defendant's conduct violated the law, we need not reach the issue of whether the law was clearly established."). To show that a law is clearly established, generally "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must

have found the law to be as the plaintiff maintains.'" Tonkovich, 159 F.3d at 516 (quoting Medina v. City & County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992)).

Because this is "an employment retaliation case asserting a First Amendment right," our analysis of whether Plaintiff has sufficiently alleged that Defendants violated his constitutional rights involves four steps. Bisbee v. Bey, 39 F.3d 1096, 1100 (10th Cir. 1994), cert. denied, 515 U.S. 1142 (1995). First, we must "determine [whether] the employee's speech involve[d] a matter of public concern." Id. Second, we "must 'balance the interests of the employee in making the statement against the public employer's interests in the effective and efficient fulfillment of its responsibilities to the public.'" Id. (citation omitted). Third, if the balance "tips in favor of the plaintiff, then he must show 'that the protected speech was a "motivating factor" in the decision.'" Id. (citations omitted). Finally, if the employee makes this showing, "'the burden then shifts to the employer to show by a preponderance of evidence that it would have reached the same decision in the absence of the protected activity.'" Id. (citation omitted).

Plaintiff cannot meet the first prong of the qualified immunity standard because he cannot satisfy all four factors as to either of his First Amendment claims, which he must do to prevail. With respect to Plaintiff's claim that he was

fired for reporting employee thefts, we note that although this speech was constitutionally protected because it involved a matter of public concern, see Bisbee, 39 F.3d at 1100, Plaintiff has not established that the speech was a motivating factor in his termination. The mere temporal proximity of Plaintiff's protected speech to his termination is insufficient, without more, to establish retaliatory motive. See Marx v. Schnuck Mkts, Inc., 76 F.3d 324, 329 (10th Cir.), cert. denied, 518 U.S. 1019 (1996); Love v. Re/Max of Am., Inc., 738 F.2d 383, 386 (10th Cir. 1984). In addition, Plaintiff's alleged statements regarding the thefts did not implicate any of the individual defendants named in this action, which implies that none of them had any motivation for retaliating against him for reporting the thefts. It is also noteworthy that the employee who told Plaintiff about the thefts and who reported the thefts to departmental supervisors was later named employee of the year. At the very least, this fact suggests that Plaintiff probably would not have been punished for reporting the thefts. Because Plaintiff has not established that his report of employee thefts was a motivating factor in his termination, he cannot show that a deprivation of his First Amendment rights has occurred. We therefore agree with the district court that the individual defendants are entitled to qualified immunity on Plaintiff's claim that he was terminated in retaliation for reporting employee thefts.

Similarly, because Plaintiff has not sufficiently alleged the violation of a

constitutional right, he cannot meet the first prong of the qualified immunity standard on his claim involving his arbitration testimony. Applying the four-step analysis for determining whether Plaintiff has sufficiently alleged a First Amendment violation, we note that neither the Supreme Court nor this circuit has held that arbitration testimony is speech involving a matter of public concern. However, this case does not require us to reach that issue. Even assuming that Plaintiff's testimony involved a matter of public concern, he has not satisfied the third factor of the test because he has not shown that his testimony was a motivating factor in his termination.

Plaintiff has offered only doubtful and inconclusive evidence in support of his allegation that Defendants fired him for testifying at the arbitration. For example, Plaintiff contends that various city officials' disappointment with the outcome of the arbitration, which was unfavorable to the City, demonstrates that his termination was connected to his testimony. Plaintiff also seems to argue that Mr. Robnett's remark about the arbitration to Plaintiff and his subsequent statement that Plaintiff seemed encouraged by the outcome of the arbitration somehow indicate that Defendants were angered by, or upset about, Plaintiff's testimony. Further, Plaintiff contends that Ms. Vernon's laugh in response to his statement to her that he was being disciplined for his testimony shows that she retaliated against him for testifying at the arbitration. Each of these incidents is

ambiguous at best, and they simply do not demonstrate that Plaintiff's arbitration testimony was a motivating factor in his termination. Additionally, there is no evidence indicating that any of the individual defendants knew the content of Plaintiff's testimony, tried to prevent him from testifying, or made any specific remarks concerning his testimony. In fact, the record indicates that Plaintiff was not punished after testifying; instead, he received a merit-based pay increase shortly after he testified at the arbitration hearing. Plaintiff has failed to show that his testimony was a motivating factor in his termination and thus has failed to make the required threshold showing that any of the individual defendants violated his constitutional rights. As a result, we agree with the district court that the individual defendants are entitled to qualified immunity on Plaintiff's claim that he was terminated in retaliation for his arbitration testimony.[4]

Because our conclusion that the individual defendants are entitled to qualified immunity rests on the determination that none of them violated Plaintiff's constitutional rights, the City may not be found to have violated his rights. See Wilson v. Meeks, 98 F.3d 1247, 1255 (10th Cir. 1996) (explaining that where individual defendants committed no constitutional violation, municipal

---

[4]Because Plaintiff has not sufficiently alleged a constitutional violation on either of his First Amendment claims, we need not address the second prong of the qualified immunity standard, i.e. whether the constitutional right implicated by Plaintiff's claims is clearly established. See Koby, 63 F.3d at 1533.

liability may not be imposed); Hinton v. City of Elwood, Kan., 997 F.2d 774, 782 (10th Cir. 1993) ("A municipality may not be held liable where there was no underlying constitutional violation by any of its officers."). We conclude that the district court properly entered summary judgment in favor of the individual defendants and the City on Plaintiff's First Amendment claims.

B.

Plaintiff also argues that the district court erred in holding that he did not establish a prima facie case of discrimination under the ADA because he failed to produce evidence indicating that he was treated differently than similarly situated individuals without disabilities. See Butler, 974 F. Supp. at 1401. ADA cases without direct evidence of discrimination generally are evaluated under the burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997). The McDonnell Douglas analysis is particularly appropriate where, as in this case, "the employer disclaims reliance on the plaintiff's disability for an employment decision."[5] Id. at 1323 n.3 (citing White v. York Int'l Corp., 45 F.3d

---

[5]By contrast, "[i]f the employer admits that the disability played a prominent part in the decision, or the plaintiff has other direct evidence of discrimination based on disability, the burden-shifting framework may be unnecessary and inappropriate." Morgan, 108 F.3d at 1323 n.3.

-21-

357, 361 n.6 (10th Cir. 1995)); accord Runnebaum v. NationsBank of Md., N.A., 123 F.3d 156, 164 (4th Cir. 1997); Ennis v. National Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 57-58 (4th Cir. 1995).

Under McDonnell Douglas, the plaintiff bears the initial burden of establishing a prima facie case by a preponderance of the evidence. See McDonnell Douglas, 411 U.S. at 802. Once the plaintiff has established a prima facie case, a rebuttable presumption of unlawful discrimination arises. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993). The defendant then bears the burden of producing a legitimate, nondiscriminatory reason for the adverse employment decision. See McDonnell Douglas, 411 U.S. at 802. If the defendant is able to articulate a valid reason, the plaintiff has the opportunity to prove that the defendant's stated reason "was in fact pretext." Id. at 804. At all times, the plaintiff bears the ultimate burden of proving discrimination. See Hicks, 509 U.S. at 508, 515-16.

To establish a prima facie case of discrimination under the ADA, Plaintiff must demonstrate "(1) that he is 'disabled' within the meaning of the ADA,[6]

---

[6]We do not address the ample evidence describing Plaintiff's psychological condition because the district court implicitly assumed that, for purposes of establishing a prima facie case of discrimination, Plaintiff qualified as a disabled person within the meaning of the ADA. Defendants have not challenged this assumption on appeal.

(2) that he is qualified—with or without reasonable accommodation;[7] and (3) that he was discriminated against because of his disability." Siemon v. AT&T Corp., 117 F.3d 1173, 1175 (10th Cir. 1997); see also Aldrich v. Boeing Co., 146 F.3d 1265, 1269 (10th Cir.), petition for cert. filed, 67 U.S.L.W. 3376 (U.S. Nov. 23, 1998) (No. 98-859); Morgan, 108 F.3d at 1323; White, 45 F.3d at 360-61. In this case, the district court addressed only the third element of the prima facie case, which requires the plaintiff to come forth with evidence showing that the adverse employment decision was because of his disability. The district court found that Plaintiff "fail[ed] to point to any evidence indicating that Defendant City of Prairie Village terminated him due to his alleged disability." Butler, 974 F. Supp. at 1401.

We begin our analysis with a close examination of the third prong of the prima facie case. The final element of a prima facie case of disability discrimination is distinct from the parallel requirement in cases involving race, gender, or age, which calls for a showing that the plaintiff was replaced by a person outside of the protected class.[8] See Ennis, 53 F.3d at 58. Unlike many

_____

[7]Because Defendants have not challenged whether Plaintiff is qualified on appeal, we do not address this issue.

[8]The final prong of the prima facie case differs somewhat for reduction-in-force cases filed under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634, because frequently the plaintiffs are laid off and are unable to prove actual replacement by younger employees. See Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1166 (10th Cir.) (explaining that fourth prong in reduction-

-23-

race, gender, or age discrimination plaintiffs, "the [ADA] plaintiff [often] . . . will be unable to determine whether a replacement employee is within or without the protected class," and "even if the plaintiff could obtain such information, requiring a showing that the replacement was outside the protected class would lead to the dismissal of many legitimate disability discrimination claims." Id. at 58-59. As a result, to establish the third element of a prima facie case of disability discrimination, the plaintiff must show that she was terminated because of her disability, or that the employer terminated the plaintiff "under circumstances which give rise to an inference that the termination was based on her disability." Morgan, 108 F.3d at 1323. This showing "requires the plaintiff to present some affirmative evidence that disability was a determining factor in the employer's decision." Id. at 1323 (citing Ennis, 53 F.3d at 59). In other words, "[t]he plaintiff must present evidence that, if the trier of fact finds it credible, and the employer remains silent, she would be entitled to judgment as a

---

in-force cases requires plaintiff to introduce circumstantial or direct evidence from which a finder of fact might reasonably infer intentional discrimination), cert. denied, __ U.S. __, 119 S. Ct. 617 (1998); Branson v. Price River Coal Co., 853 F.2d 768, 771 (10th Cir. 1988) ("Courts have modified the fourth *prima facie* element [in reduction-in-force cases] by requiring the plaintiff to 'produc[e] evidence, circumstantial or direct, from which a factfinder might reasonably conclude that the employer intended to discriminate in reaching the decision at issue." (citation omitted)). The final prong "may be established through circumstantial evidence that the plaintiff was treated less favorably than younger employees during the reduction-in-force." Branson, 853 F.2d at 771.

-24-

matter of law." Id. at 1324 (citing Ennis, 53 F.3d at 59). "This formulation [of the third prong] should not be interpreted as diminishing the plaintiff's burden in proving her *prima facie* case. While the burden is 'not onerous,' it is also not empty or perfunctory." Ennis, 53 F.3d at 59 (internal citation omitted).

After thoroughly reviewing the record and construing the evidence in a light most favorable to Plaintiff, see Kaul, 83 F.3d at 1212, we conclude that the district court erred in finding that Plaintiff failed to make out a prima facie case of discrimination. Admittedly, there is no direct evidence in the record that the performance evaluations by Plaintiff's supervisors or the disciplinary measures taken against him were related to his alleged disability, nor is there evidence that his supervisors made any comments or remarks about his disability. However, the record indicates that Plaintiff's supervisors' evaluations of his work declined soon after Plaintiff announced his disability and requested an accommodation. The record also shows that after Plaintiff requested an accommodation, Mr. Robnett and Ms. Vernon both made comments about his inability to complete his work in a timely manner.[9] The temporal proximity of Plaintiff's request for an accommodation to the decline in his work evaluations and his supervisors' complaints about his work performance contributes to an inference that Plaintiff's

---

[9]We note that Plaintiff did not appeal the dismissal of his claim that Defendants failed to accommodate his disability in violation of the ADA.

-25-

position was eliminated because of his disability. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994) (stating that the sequence of events leading to a discharge may contribute to a permissible inference of discriminatory intent).

In addition to this circumstantial evidence, the record contains evidence of disparate treatment. Specifically, at the time Ms. Vernon eliminated the two assistant director positions, only Plaintiff's position was occupied. The other assistant director position had been unoccupied for several months. Further, out of the nine positions eliminated in the five years prior to 1996, Plaintiff's position was the only one that was occupied when it was eliminated. That is, apart from Plaintiff, no other City employee lost his or her job as a result of a departmental reorganization.

Additionally, Plaintiff's complaint of harassment against Ms. Vernon was investigated differently than similar claims asserted by other employees. Plaintiff's complaint, which he delivered to Mayor Taliaferro after Ms. Vernon gave Plaintiff his unfavorable performance report, alleged that he was "harassed, intimidated, isolated from other employees, and written up with disciplinary warnings, repeatedly, with the express purpose of removing [him] from [his] position." Pl.'s App., Vol. II, Doc. 18 at 1. Mayor Taliaferro immediately passed Plaintiff's complaint along to Ms. Vernon. Because the complaint alleged that

Ms. Vernon was harassing Plaintiff, the director of personnel, who was a subordinate of Ms. Vernon, was assigned to investigate Plaintiff's complaint. There is no indication that the personnel director investigated Plaintiff's complaint, and neither Plaintiff nor Ms. Vernon was interviewed about the allegations contained in the complaint. In fact, when asked in discovery to produce "[a]ny documents prepared in the course of or as part of the investigation . . . of the internal complaint(s) of harassment [Plaintiff] lodged against Barbara Vernon on or about December 3, 1993 and on or about January 18, 1994," the City responded: "Defendant has no documents responsive to this request." Id., Doc. 20 at 2. Mayor Taliaferro also did not personally investigate Plaintiff's allegations. However, Mayor Taliaferro wrote Plaintiff a letter in which he concluded that "there are no facts documented that would prove harassment of you by Barbara Vernon." Id., Doc. 19.

Plaintiff presented evidence that other employee harassment complaints were handled in a more thorough and systematic fashion. Other complaining employees and their alleged harassers were interviewed. Acting as the investigator, Ms. Vernon also made extensive notes about the incidents and sometimes drafted formal reports summarizing her findings and conclusions. In fact, Ms. Vernon testified in her deposition that the "standard method or procedure" for handling a harassment complaint is to interview the persons

involved in or who might have knowledge about the alleged incidents. See id., Vol. I, Vernon Dep. at 13-14. In combination with the evidence showing that Plaintiff's work evaluations declined and his supervisors began complaining about his work, this evidence of disparate treatment permits a reasonable inference of discrimination based on disability, which satisfies the third element of Plaintiff's prima facie case.

Because we have concluded that Plaintiff set forth a prima facie case of discrimination under the ADA, we must examine whether the City proffered a legitimate, nondiscriminatory reason for its decision to terminate Plaintiff's employment. Once a defendant articulates a legitimate reason, "the plaintiff's burden is only to demonstrate a genuine dispute of material fact as to whether the proffered reasons were unworthy of belief." Morgan, 108 F.3d at 1321. "To avoid summary judgment, a plaintiff need not demonstrate that discriminatory reasons motivated the employer's decision." Id. at 1321-22. In this case, the City claims that it terminated Plaintiff as a result of its decision to reorganize the department in which Plaintiff was employed. In response to the City's proffered reason, Plaintiff asserts that the departmental reorganization was merely a pretext for firing him on the basis of his disability.

Viewing the facts in a light most favorable to Plaintiff, we conclude that he has alleged sufficient facts to establish genuine issues of material fact on whether

the City's reason for terminating him was pretextual. Notably, the record reflects that nine months after Ms. Vernon reorganized the Public Works Department and eliminated Plaintiff's position, a new position entitled "Project Coordinator" was created in the department. Although more detailed factual development is needed on this point, the record shows that the duties for which the project coordinator is responsible appear substantially to overlap the duties for which Plaintiff was responsible as an assistant director. For example, the City admits that at least one of the project coordinator's central duties was unique to Plaintiff's former position, namely planning and administering utility and contract construction. See Appellees' Br. at 32. The City contends that the department director performs most of Plaintiff's former duties and that the descriptions of three of the project coordinator's duties "are so broad and vague that they are meaningless for the purposes of this discussion." Id. at 32. In our view, however, the broad and vague way in which the project coordinator's duties are described merely underscores the need for this evidence to be presented to the trier of fact. See Randle v. City of Aurora, 69 F.3d 441, 453 (10th Cir. 1995) (emphasizing that genuine issues of material fact about the employer's motivation in pretext cases are for the trier of fact). Moreover, the qualifications for the project coordinator and assistant director positions seem to be identical. Both positions require a college degree in engineering or a related field or an equivalent combination of

formal training and related experience. The salary ranges for the two positions also are similar. The salary range is $2,100 to $3,000 per month for the project coordinator position; Plaintiff earned approximately $2,500 per month as an assistant director. In short, we think that the resurrection of at least some of Plaintiff's duties shortly after his termination in a position requiring similar qualifications with a similar salary range sufficiently creates a genuine issue of material fact about whether the reason given by the City was pretextual. Cf. Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1226-27 (2d Cir. 1994) (holding that resurrection of publications for which plaintiff was responsible within nine to ten months of her termination and employer's failure to interview plaintiff for new position created genuine issues of material fact as to whether reduction-in-force was a pretext for age discrimination).

Additional facts also support Plaintiff's pretext argument. The record shows that after Plaintiff requested to limit his work to forty hours per week, he continued to receive more work than he could successfully complete in that time period. Both Mr. Robnett and Ms. Vernon complained about having to take over some of Plaintiff's tasks in order to complete the work in a timely fashion. Whether this evidence demonstrates that Plaintiff was given more work than he could complete in a forty-hour week or that Plaintiff's work performance was deteriorating is in dispute and, therefore, is also more suitable for determination

by the trier of fact. Nevertheless, we think that, on its face, this evidence contradicts the City's argument that the reorganization implemented by Ms. Vernon was based on her conclusion that Plaintiff's position was unnecessary. Ms. Vernon's allegation that a prior assistant director told her that he did not believe his position was needed is not to the contrary because it does not demonstrate that both assistant director positions were unnecessary.

In light of this evidence, we conclude that Plaintiff has alleged sufficient facts to establish genuine issues of material fact on whether the reorganization was a pretext for terminating him. Of course, even if Plaintiff succeeds in proving that the reason proffered by the City was pretextual, he still bears the ultimate burden of establishing intentional discrimination. See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981) ("The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."); McCullough v. Real Foods, Inc., 140 F.3d 1123, 1128 (8th Cir. 1998) (noting that Supreme Court has "made clear that a plaintiff in a pretext case must establish '*both* that the reason was false, *and* that discrimination was the real reason'" (citation omitted)).

For the foregoing reasons, we hold that summary judgment in favor of the City was improper on Plaintiff's ADA discrimination claim.

C.

Finally, Plaintiff argues that the district court erroneously entered summary judgment in favor of the City on his claim of retaliation under the ADA. The district court ruled that, although Plaintiff made out a prima facie case of retaliation and the City came forward with a legitimate, nondiscriminatory reason for his termination, Plaintiff failed to demonstrate that the City's reason was merely a pretext for firing him in retaliation for requesting an accommodation. While the district court correctly concluded that Plaintiff failed to recite any evidence demonstrating that the City's reason for terminating him was pretextual in his response to the City's motion for summary judgment, see Butler, 974 F. Supp. at 1403, Plaintiff did reference an earlier section of his brief, see R., Vol. 4 at 93, in which he presented the basis for his argument that the City's reason was pretextual and that the real reason for his termination was that he was disabled and asked for an accommodation. See id. at 79-86.

The ADA expressly prohibits retaliation against individuals who have "opposed any act or practice made unlawful by this chapter or . . . made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a); see also id. § 12203(b) ("It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of . . . any right granted or protected by this

chapter."). As with discrimination claims, once the plaintiff has established a prima facie case of retaliation, the employer has the burden of coming forth with a legitimate, nondiscriminatory reason for its adverse action. See Sauers, 1 F.3d at 1128. If the employer does so, the plaintiff may then present evidence that the reason given by the employer is a mere pretext for the real, discriminatory reason for the adverse action. See id.

In response to Plaintiff's retaliation claim, the City proffered the same reason for terminating Plaintiff's employment as it did in response to his discrimination claim, i.e., Ms. Vernon's decision to eliminate Plaintiff's position pursuant to a reorganization of the Public Works Department. However, the evidence of pretext supporting Plaintiff's discrimination claim also supports his pretext argument on his retaliation claim. First, the City resurrected most of Plaintiff's former duties in a new position shortly after his termination. Second, after Plaintiff requested an accommodation, he received more work than he could successfully complete and his supervisors complained about having too much work because they had to cover for him. Third, Plaintiff's position was the only one that was eliminated while it was occupied.

Additionally, the temporal proximity of certain events during Plaintiff's employment also supports his pretext argument. For example, Ms. Vernon's decision to reorganize occurred within weeks of Plaintiff's delivery of a

-33-

complaint to Mayor Taliaferro about her supervision. Plaintiff's work evaluations also declined sharply within months after he told Mr. Robnett about his depression and requested an accommodation to his work schedule. This court previously has recognized that "protected conduct closely followed by adverse action may justify an inference of retaliatory motive" even though we have "rejected attempts to unduly stretch the 'close temporal proximity' required under this standard." Marx, 76 F.3d at 329 (reversing summary judgment on plaintiff's Fair Labor Standards Act retaliation claim) (internal citations omitted); see also Love, 738 F.2d at 386 (stating that temporal proximity may justify inference of retaliatory motive and sustaining finding of retaliation under Title VII where termination occurred within two hours of engaging in protected activity); Burrus v. United Tel. Co. of Kan., Inc., 683 F.2d 339, 343 (10th Cir.) (noting that protected conduct closely followed by adverse action may justify inference of retaliatory motive), cert. denied, 459 U.S. 1071 (1982). The temporal proximity of these events may be insufficient, standing alone, to raise an inference of retaliatory motive. See Marx, 76 F.3d at 329; Love, 738 F.2d at 386. Nevertheless, in combination with the additional circumstantial evidence, this evidence suffices to create genuine issues of material fact as to whether Defendant's proffered reason for terminating Plaintiff was pretextual. We hold that summary judgment on Plaintiff's retaliation claim in favor of the City was

also erroneous.

In sum, we hold that personal capacity suits against individuals who do not otherwise qualify as individuals are precluded.  We affirm the district court's entry of summary judgment on Plaintiff's claims that he was retaliated against in violation of the First Amendment.  We reverse the district court's entry of summary judgment on Plaintiff's ADA discrimination and retaliation claims and remand for proceedings consistent with this opinion.

**AFFIRMED** in part, **REVERSED** in part, and **REMANDED**.