Alfred Milton EVANS, an individual; Southeastern Oklahoma Family Services, Inc., a corporation; Dottie R., an individual; Tommy W., an individual; Rhonda C., an individual; Olive D., as an individual and as legal guardian to Elizabeth E., Brian E. and Douglas E.; Elizabeth E.; Brian E.; Douglas E., Plaintiffs–Appellees,

v.

Mike FOGARTY, in his individual capacity, as well as in his official capacity as Chief Executive Officer for the Oklahoma Health Care Authority; Terri Fritz, in her individual capacity, as well as in her official capacity as Director of Behavioral Health for the Oklahoma Health Care Authority; Lynn Mitchell, Dr., in his individual capacity, as well as in his official capacity as State Medicaid Director for the Oklahoma Health Care Authority; Dana Brown, in her individual capacity, as well as in her official capacity as Legislative Liaison from the Oklahoma Health Care Authority; T.J. Brickner, Jr., in his official capacity as Vice–Chairman of the Oklahoma Health Care Authority; Ronald Rounds, O.D., in his official capacity as member of the Oklahoma Health Care Authority Board of Directors; Wayne Hoffman, in his official capacity as a member of the Oklahoma Health Care Authority Board of Directors; Jerry Humble, in his official capacity as a member of the Oklahoma Health Care Authority Board of Directors; Charles Ed McFall, in his official capacity as Chairman of the Oklahoma Health Care Authority Board of Directors; George Miller, in his official capacity as member of the

Oklahoma Health Care Authority Board of Directors; Lyle Roggow, in his official capacity as member of the Oklahoma Health Care Authority Board of Directors, Defendants–Appellants.

No. 01–6066.

United States Court of Appeals, Tenth Circuit.

Aug. 21, 2002.

Before LUCERO, McKAY, and MURPHY, Circuit Judges.

## ORDER AND JUDGMENT[*]

LUCERO, Circuit Judge.

Plaintiffs, including the Southeastern Oklahoma Family Services ("SOFS"), brought this suit under 42 U.S.C. § 1983, alleging that defendants—various state health officials—retaliated against them because of their speech on matters of public concern. Acting on plaintiffs' motion for a preliminary injunction, the district court found a substantial likelihood of plaintiffs' success on the merits and enjoined defendants from taking certain administrative actions. Pursuant to 28 U.S.C. § 1292(a)(1), defendants appealed the entry of that injunction, challenging various factual findings of the district court. We narrowly review for abuse of discretion and affirm.

## I

Before a preliminary injunction may be entered, plaintiffs must establish:

> (1) a substantial likelihood of success on the merits of the case; (2) irreparable injury to the movant if the preliminary injunction is denied; (3) the threatened injury to the movant outweighs the injury to the other party under the preliminary injunction; and (4) the injunction is not adverse to the public interest.

*Kikumura v. Hurley,* 242 F.3d 950, 955 (10th Cir.2001). A preliminary injunction is an extraordinary remedy that should not be granted unless the right to relief is "clear and unequivocal." *Id.* at 955 (quotation omitted). "But while the standard to be applied by the district court in deciding whether a plaintiff is entitled to a preliminary injunction is stringent, the standard of appellate review is simply whether the issuance of the injunction, in the light of the applicable standard, constituted an abuse of discretion." *Id.* at 931–32. Under the abuse-of-discretion standard,

> we give due deference to the district court's evaluation of the salience and credibility of testimony, affidavits, and other evidence. We will not challenge that evaluation unless it finds no support in the record, deviates from the appropriate legal standard, or follows from a plainly implausible, irrational, or erroneous reading of the record.

*United States v. Robinson,* 39 F.3d 1115, 1116 (10th Cir.1994) (citation omitted). "An abuse of discretion occurs when the district court bases its ruling on an erroneous conclusion of law or relies on clearly erroneous fact findings." *Kiowa Indian Tribe v. Hoover,* 150 F.3d 1163, 1165 (10th Cir.1998).

## II

Plaintiffs include SOFS, a mental health care provider that serves approximately 740 patients in southeastern Oklahoma; various SOFS patients; and Alfred M. Evans, a "vocal critic of Oklahoma's current system of Medicaid funding" who is a mental health care provider and contract consultant to SOFS. (1 Appellant's App. at 78 (Feb. 12, 2001 order).) They brought this suit alleging that various officers and directors of the Oklahoma Health Care Authority ("HCA"), a state entity responsible for disbursing Medicaid funds to state-contracted Medicaid facilities, retaliated against them because of their speech on matters of public concern in violation of the First Amendment. Plaintiffs also alleged violation of their due process rights; "the Boren Amendment guarantees of rea-

* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

sonable and adequate reimbursements under the Medicaid program"; "the Boren Amendment guarantees of reasonable access to and adequate quality of Medicaid services"; "the Medicaid Act's guarantee of medical services that are of sufficient amount, duration, and scope"; and "42 U.S.C. § 6009 guarantees of appropriate treatment, services, and habilitation for disabled persons." (1 *id.* at 79 (Feb. 12, 2001 order).)

In 1996, Evans formed Texoma Mental Health Services "to provide mental health services in southern Oklahoma". and obtained a contract that allowed Texoma to provide such services under the state's Medicaid program. (2 *id.* at 201 (Evans's testimony).) As proprietor of this company, Evans "lobbied various government officials, including the Governor and various state legislators, to provide greater funding for private medical care providers in the state." (1 *id.* at 80 (Feb. 12, 2001 order).) Plaintiffs claim that defendants terminated Texoma's Medicaid contract in response to "Evans's crusade for Medicaid reform." (*Id.*) Defendants, however, claim that Texoma's Medicaid contract was terminated because of "substantial billing irregularities that were uncovered through the HCA auditing process." (*Id.*)

Texoma entered Chapter 7 bankruptcy after the contract termination, and "[i]n an effort to continue services, Evans started SOFS, a new non-profit mental health company. In order to keep his involvement with SOFS from the defendants, Evans is not directly affiliated with SOFS but rather works as a consultant." (*Id.*) Within a few months of Texoma's demise, SOFS absorbed most of Texoma's employees and clients. Currently, SOFS serves about 740 patients in a ten-county area of southeastern Oklahoma.

On October 19, 2000, the HCA conducted an unannounced audit of SOFS's Hugo,

Oklahoma, facility. "During that audit, certain records were inspected and cataloged. While complete findings were not issued at that time, the auditors notified SOFS officials that various violations were taking place." (1 *id.* at 81 (Feb. 12, 2001 order).) The district court described the subsequent events:

Evans continued his efforts on behalf of Medicaid reform by filing an Oklahoma Open Records Act request on November 22, 2000. In it, Evans sought detailed information on the HCA's spending and administrative practices. Two business days later, on November 28, 2000, SOFS's Ardmore facility was the subject of an audit conducted by the HCA. Once again, complete findings were not made on site, but the auditors noted various violations of HCA policy. Plaintiffs claim, however, that the exit interview with the HCA auditors was very positive and complimentary. The auditors apparently made "commendations" and were very helpful in devising solutions to the apparent deficiencies. On December 4, 2000, the HCA sent a letter to Evans informing him that his Oklahoma Open Records Act request would be expensive, and that Evans would be responsible for bearing the cost. The letter also gave Evans an opportunity to withdraw his request. Evans declined and informed the HCA of his intention to proceed with the request on December 19, 2000.

(*Id.*)

On December 14 and 19, the HCA released full results of the Hugo and Ardmore audits, respectively, discussing "deficiencies in SOFS's performance" and seeking recoupment of paid Medicaid funds. (1 *id.* at 81–82 (Feb. 12, 2001 order).) When, in late December, the HCA had not responded to Evans's renewed open-records request, he again sought the

information. Evans's "discussions with the HCA revealed an apparent mis-communication; Evans was informed that his renewed request had not been received but that it was now going forward." (1 *id.* at 82.)

On January 8, 2001, the HCA sent a letter to SOFS stating its intention to cancel SOFS's Medicaid contracts. The letter mentioned serious deficiencies in the company's performance, but "chose to terminate the contract without cause." (*Id.*) In the meantime, SOFS was placed on manual-review status. "This 'on review' status apparently requires SOFS to submit all its billing manually rather than through the electronic system normally used." (*Id.*)

"Negotiations between the parties continued and on January 19, 2001, after a meeting with state representative Randal Erwin, the HCA chose to temporarily suspend the termination of SOFS's Medicaid contracts. Currently, the Medicaid contracts are continuing, but SOFS is required to manually submit all of its billings." (*Id.*)

### III

■ As an initial matter, the parties disagree as to whether the preliminary injunction entered by the district court was "mandatory" or "prohibitory" in nature. "A mandatory preliminary injunction (i.e., one that directs a party to act) imposes an even heavier burden on the movant of showing that the [relevant] factors ... weigh heavily and compellingly in movant's favor." *United States v. Power Eng'g Co.*, 191 F.3d 1224, 1230 (10th Cir. 1999) (quotation omitted); *see also Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 269 F.3d 1149, 1154–55 (10th Cir.2001). The heightened burden also applies to injunctions that disturb the status quo and provide the movant substantially all of the relief it seeks from a full trial on

the merits. *Dominion Video*, 269 F.3d at 1154–55.

The district court characterized its injunction as mandatory, stating, "Plaintiffs must make a heightened showing because they request the Court to command defendants to alter the status quo by returning plaintiffs to an automatic billing system." (1 Appellants' App. at 83.) It is true that the preliminary injunction in this case *mandates* defendants "to return SOFS to the automated billing procedure" and "to hold the termination of SOFS's Medicaid contracts in abeyance pending the outcome on the merits of the present suit." (1 *id.* at 95.) Nevertheless, under our precedent, the district court's injunction is properly classified as prohibitory.

To determine whether an injunction is mandatory or prohibitory, we look at the substance of the injunction and compare it to the status quo ante—i.e., the "last uncontested period preceding the injunction." *Dominion Video*, 269 F.3d at 1155. In *Dominion Video*, we held that a preliminary injunction that required defendant to take affirmative action to activate satellite TV subscribers was not mandatory. We thought it important that the injunction did "not compel [defendant] to do something it was not already doing during the last uncontested period preceding the injunction." *Id.* In this case, the last uncontested period was before the HCA notified SOFS of its termination of its Medicaid contract and before SOFS was placed on "on review" status, which "requires SOFS to submit all its billing manually rather than through the electronic system normally used." (1 Appellants' App. at 82.) As in *Dominion Video*, the preliminary injunction in this case does not require defendants to do something that they were not doing during the last uncontested period. Therefore, the heightened burden at-

tendant to mandatory injunctions need not be sustained.

## IV

We turn to the substance of plaintiffs' First Amendment claim. In *Board of County Commissioners v. Umbehr*, 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996), the Supreme Court held that the "First Amendment's guarantee of freedom of speech protects government employees from termination *because of* their speech on matters of public concern," *id.* at 675, and that the same protection is afforded to government contractors, *id.* at 678. A government contractor's rights depend on balancing the following considerations:

1. Whether the speech in question involves a matter of public concern.

2. If so, we must weigh the employee's interest in the expression against the government employer's interest in regulating the speech of its employees so that it can carry on an efficient and effective workplace.

3. Employee must show the speech was a substantial factor driving the challenged governmental action.

4. If so, can the employer show that it would have taken the same employment action against the employee even in the absence of the protected speech?

*Kent v. Martin*, 252 F.3d 1141, 1143 (10th Cir.2001) (quotation omitted). The first two questions are questions of law, and the latter two are questions of fact. *Id.*

## A

In this interlocutory appeal, defendants focus on the likelihood-of-success prong of the preliminary-injunction standard. First, they contend that the district court erroneously found that plaintiffs would likely show that Evans's lobbying efforts were a substantial or motivating factor for

the actions taken against SOFS. This is a question of fact. *Id.* We stress that we will not overturn the injunction merely because we would have come to a different conclusion than did the district court. Our review, though meaningful, is sharply circumscribed by the applicable standard of review, which requires that the district court's findings be sustained unless we are left "with the definite and firm conviction that a mistake has been committed," *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

■ The district court determined that "the evidence presented during the hearing demonstrates an uncanny correlation between Evans' exercise of free speech rights and administrative actions taken by the HCA." (1 Appellants' App. at 84.) Defendants take issue with this determination, arguing that "the district court erred ... when it found that the timing of Medicaid officials['] actions caused a likelihood of success of Evan's [*sic*] First Amendment claim." (Appellants' Br. at 20.) Defendants point to *Butler v. City of Prairie Village*, 172 F.3d 736 (10th Cir.1999), in which we held, "Plaintiff has not established that the speech was a motivating factor in his termination. The mere temporal proximity of Plaintiff's protected speech to his termination is insufficient, without more, to establish retaliatory motive." *Id.* at 746.

In our view, the district court's finding that Evans's lobbying efforts were substantial or motivating factors passes clear-error review. As the court stated:

When Evans opposed the HCA by lobbying the legislature for additional funding, his predecessor company, Texoma, lost its Medicaid contract. When Evans submitted an Oklahoma Open Record Act request to the HCA, the HCA instituted an audit of SOFS's Ard-

more facility two business days later....

To further add to the series of coincidences, the HCA contacted Evans and gave him an opportunity to withdraw his open records act request a few days after the audit. In addition, on December 19, 2000, the day Evans renewed his request for information, the HCA released the audit report that harshly criticized SOFS's Ardmore facility even though the auditors had been very complimentary during their exit interview.

The series of coincidences continued into January 2001. The HCA claims to have misplaced Evans' information request. Evans again renewed his request on January 3, 2001, and on January 8, 2001, SOFS received notice that the HCA was terminating all of SOFS's Medicaid contracts. This letter was followed by notice that SOFS was being put on an "on review" status mandating manual billing procedures on January 10, 2001.

(1 Appellants' App. at 85.) As we held in *Marx v. Schnuck Markets, America, Inc.,* an inference of retaliatory motive may be drawn from "protected conduct closely followed by adverse action" combined with a pattern of actions taken by defendants. 76 F.3d 324, 329 (10th Cir.1996) (Fair Labor Standards Act case).

Defendants also contend that the district court's finding cannot stand because there is no direct evidence that any defendants had "knowledge of Mr. Evan's [*sic*] lobbying efforts or his letter to the Governor," and "it is difficult to understand why an agency official would retaliate when a lobbyist attempts to garner monies for an agency which Mr. Evans stated that he did." (Appellants' Br. at 22.) However, there is evidence in the record that defendant Dana Brown, HCA's legislative liaison, told Evans that he "need[ed] to leave

them alone, she and the Health Care Authority. She did not want to meet with [Evans] when [they] met with the representative Randall Erwin and the Health Care Authority...." (2 Appellants' App. at 261 (Evans's testimony).)

Moreover, defendants' contention that they would have no retaliatory motive because Evans was engaged in garnering money for the HCA disregards evidence that Evans was a "thorn in the side" of the HCA. (2 *id.* at 204 (Evans's testimony).) Evans testified:

We lobbied for and actually helped the Health Care Authority receive state funds of $500,000 which are used to be matching funds from the federal government to pay private providers for the reduction in services that the Health Care Authority had implemented six to seven months prior. When that money never was applied to the private providers, then I lobbied the legislature as to why and where the money went, as Texoma was abruptly without any warning not awarded its contract after.

(2 *id.* at 203.) Evans also testified that the Medicaid contracts of other lobbyists were also "abruptly closed." (2 *id.* at 204–05.) Furthermore, contrary to defendants' contention that there is no evidence that they knew Evans was connected to SOFS prior to the October and November 2000 audits of SOFS's facilities, there is evidence that Brown told Evans that his "association with Texoma had directly influenced the Health Care Authority's decision with Southeastern ...." (2 *id.* at 262 (Evans's testimony).)

**B**

■ Defendants' second contention also hinges on a factual determination made by the district court. They claim that absent the protected conduct, defendants would

have taken the same administrative actions. *See Kent*, 252 F.3d at 1143.

A successful defense that the government would have terminated a contract regardless of the protected conduct absolves the government officials of liability. In *Umbehr*, the Supreme Court held that "the government can escape liability by showing that it would have taken the same action even in the absence of the protected conduct." 518 U.S. at 675. Such a defense must be proven by a preponderance of the evidence. *See Ballard v. Muskogee Reg'l Med. Ctr.*, 238 F.3d 1250, 1253 (10th Cir.2001) ("The public employer's 'anyway' defense—if established by a preponderance of the evidence—acts as an absolute bar to liability, not merely a factor in awarding damages.").

Specifically, defendants claim that the district court "ignored the compelling testimony of Ms. Jana Webb." (Appellants' Br. at 25.) Webb testified that she, as supervisor of the Surveillance Utilization Review Systems, "make[s] decision about what cases get reviewed." (2 Appellants' App. at 336; *see* 2 *id.* at 342.) Webb further stated that she received complaints from SOFS employees regarding possibly fraudulent backdating of "intakes" (2 *id.* at 366, 369); "billing a service through a different provider number" (2 *id.* at 371); and other questionable conduct (2 *id.* at 374–76).

SOFS itself admitted that it had some "internal [record-keeping] problems" that it had to address. (3 *id.* at 506 (Feb. 1, 2001 letter from SOFS to HCA).) Although the testimony cited by defendants certainly does not cut in plaintiffs' favor, it does not constitute conclusive proof that the HCA would have taken the same administrative actions. Probative on this issue are (1) the fact that, despite SOFS's troubles, the HCA eventually chose to "suspend the termination of SOFS's Medicaid contracts" (1 *id.* at 82 (Feb. 12, 2001 order)), and (2) evidence that the region served by SOFS "is lacking in the necessary facilities to treat a growing population of mentally and behaviorally ill individuals" (Appellees' Br. at 13).

## C

Defendants put forth a last set of claims, beginning with their assertion that the district court erred in concluding that "plaintiffs have shown a substantial likelihood of success on the merits with regard to their due process claim as well." (1 Appellants' App. at 87.) Since the injunction was issued, the district court dismissed plaintiffs' due process claim, and, for purposes of this appeal, plaintiffs concede this point. Because the district court concluded that the First Amendment claim would likely prevail on the merits, however, defendants' due-process contention is a non-issue. Defendants further contend that the district court incorrectly ruled that the Oklahoma Uniform Commercial Code, Okla. Stat. tit. 12A, § 1–203, imposed upon them a duty of good faith. This conclusion, however, relates to the district court's treatment of plaintiffs' due process claim, and we thus need not address it.

Finally, defendants claim that the district court "incorrectly concluded federal statutory claims legally supported SOFS' claims." (Appellants' Br. at 27.) The district court concluded that although some of plaintiffs' statutory claims "may not be successful," plaintiffs nevertheless showed "a likelihood of success on the remainder of the claims." (1 Appellants' App. at 88.) Specifically, the district court held that "[t]he rights guaranteed by 42 C.F.R. § 440.230 and 42 U.S.C. § 6009 appear to be infringed by defendants['] actions." (*Id.* (footnote omitted).) Defendants say nothing about 42 C.F.R. § 440.230, and their only argument regarding 42 U.S.C.

§ 6009 is that it has been repealed. This was acknowledged by the district court, which stated:

> [Title] 42 U.S.C. § 6009 was repealed by Act of October 30, 2000, Pub.L. No. 106–402 § 401. However, the rights previously codified in 42 U.S.C. § 6009 are substantially reinstated in Pub.L. No. 106–402 § 109. The Court presumes the plaintiffs wish to bring their action under this section.

(1 *id.* at 88 n. 4.) Because defendants do not address the new statute in their brief, this challenge is without merit.[1]

### V

We **AFFIRM.**

---

1. Defendants also state that 42 U.S.C. § 1396(a)(a)(13)(A) cannot provide plaintiffs' desired relief because it applies only to Medicaid hospitals and nursing homes. (Appellants' Br. at 28.) Even if true, this contention is irrelevant because the district court concluded that plaintiffs "have not shown a substantial likelihood of success on the merits" of this claim. (Appellants' App. at 88.)