**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 22, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ALFRED MILTON EVANS, an individual;
SOUTHEASTERN OKLAHOMA FAMILY
SERVICES, INC., a corporation; RUSTLING
WINDS, INC., an Oklahoma corporation; MORNING
STAR MENTAL HEALTH SERVICES, INC., an
Oklahoma corporation; DIVERSIFIED FAMILY
SERVICES, INC., an Oklahoma corporation;
SERENITY SPRINGS MENTAL HEALTH
SERVICES, L.L.C., an Oklahoma corporation; JCH,
INC., an Oklahoma corporation; NEAL THRIFT, an
individual; NANCY GRAVES-THRIFT, an
individual; JOHN MAJORS, an individual;
CYNTHIA MAJORS, an individual; CHARLES
PARKHURST, an individual; MARY PARKHURST,
an individual; LEROY WHEELER, an individual; and
JOEL HOLCOMB, an individual,

      Plaintiffs-Appellants/Cross-Appellees,

v.

MICHAEL FOGARTY, in his individual capacity, as
well as in his official capacity as Chief Executive
Officer for the Oklahoma Health Care Authority;
TERRIE FRITZ, in her individual capacity, as well as
in her official capacity as Director of Behavioral
Health for the Oklahoma Health Care Authority; and
DANA BROWN, in her individual capacity, as well
as in her official capacity as Legislative Liaison for
the Oklahoma Health Care Authority; TENKILLER
BEHAVIORAL SERVICES INC., an Oklahoma
corporation; DAVETTA MCINTOSH, an individual,

      Defendants-Appellees/Cross-Appellants.

Nos. 05-6106, 05-6109,
05-6110, 05-6112,
05-6122, 05-6358, 05-
6359, &
05-6361

## ORDER AND JUDGMENT[*]

Before **TACHA**, Chief Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and **LUCERO**, Circuit Judge.

This case arises from a bare-knuckled political battle over state funding for outpatient behavioral and mental health services in Oklahoma between 1998 and 2002.  It has resulted in a series of cases of unusual procedural complexity, as well as two jury verdicts.  We conclude that the district court abused its discretion in granting a new trial following the first verdict.  Exercising jurisdiction under 28 U.S.C. § 1291, we **REVERSE**.

## I

During the period at issue, plaintiffs[1] operated clinics, predominantly in rural areas of Oklahoma, providing services to adults and children with mental and behavioral disorders.  Plaintiffs relied almost exclusively on Medicaid

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[1] Individual plaintiffs include:  Alfred Milton Evans, John Majors, Cynthia Majors, Joel Holcomb, Neal Thrift, Nancy Graves-Thrift, Leroy Wheeler, Charles Parkhurst, and Mary Parkhurst.  Corporate plaintiffs include:  Southeastern Oklahoma Family Services, Inc. ("SOFS"), Morning Star Mental Health Services, Inc. ("Morning Star"), JCH, Inc., Rustling Winds, Inc., Serenity Springs Mental Health Services, L.L.C., and Diversified Family Services, Inc. ("DFS").

2

funding to cover the cost of providing these services, and their private clinics were among many publicly funded facilities that offered such services. Medicaid funding also flowed to state-affiliated community mental health centers ("CMHCs"), which are typically paid more than private providers for the same services.

Michael Fogarty, Terrie Fritz, and Dana Brown ("defendants") were senior officials of the Oklahoma Health Care Authority ("OHCA"), the agency charged with administering Medicaid funds, during the relevant period. Fogarty was hired as the Oklahoma state Medicaid director in 1995 and was promoted to Chief Executive Officer of OHCA in September 1999. Fritz worked under Fogarty as OHCA's Director of Behavioral Health Services. Brown also worked under Fogarty as OHCA's legislative liaison in the state Capitol.

By the late 1990s, Fogarty, Fritz, and other officials at OHCA faced substantial pressure to reduce Medicaid costs. At the same time, private providers of behavioral and mental health services were competing with CMHCs for the limited budget available for such services. Private providers had expanded rapidly, and by the year 2000 numbered some 180, located at 330 sites. Medicaid funds paid to these private providers grew from $3.1 million in 1994 to $22.1 million in 1997. Fogarty and other OHCA officials viewed the rise in overall

3

expenditures with alarm.[2] They also grew concerned about the relatively limited oversight of private providers, which they believed created an opportunity for fraud, mismanagement, and the provision of substandard services. Accordingly, OHCA took a number of steps to limit the growth in Medicaid reimbursements to private providers and to engage in more aggressive oversight of these private facilities.

A number of private providers took umbrage with OHCA's policies during this period and came to believe that Fogarty and others wanted to drive private providers out of business. As their dissatisfaction increased, a group of private providers banded together in late 1998 to form the Oklahoma Private Mental Health Providers Association ("Association"). All individual plaintiffs were members of the Association, which lobbied extensively in the state legislature, the Governor's office, and elsewhere in support of its interests.

Conflict between the Association and the defendants first came to a head in 1998, when the Association successfully persuaded the Governor not to sign a set of "emergency" rules proposed by OHCA. Those rules would have required, among other things, all therapists to obtain a master's degree within six months of adoption of the rules. Defendants supported this rule as a way to ensure quality and consistency of services, but the Association persuaded the Governor that the

---

[2] OHCA overspent the behavioral health budget line item by more than one hundred percent between 1996 and 1998

4

rules would put most private providers out of business. A second conflict arose when, in July 1999, OHCA imposed across-the-board cuts in "units of service" for mental health services by 30 percent for adults and by 5 percent for children.[3] Faced with a steep drop in revenue as a result of the cuts, the Association persuaded the legislature to pass a $500,000 supplemental appropriation in February 2000 and then a further appropriation of $1.1 million in May 2000. When combined with federal matching funds, the supplemental appropriation resulted in a $5.2 million influx, intended to restore funding to prior levels. A third conflict arose over proposed legislation, known as House Bill 1075, which would have equalized funding and oversight between CMHCs and private providers. The Association unsuccessfully supported the bill as a means of "leveling the playing field" between all providers of behavioral and mental

---

[3] Some knowledge of OHCA's reimbursement procedures is a predicate to understanding plaintiffs' claims. Private providers and CMHCs were reimbursed on the basis of "units" of services provided to individual patients. Beginning in 1996, and in response to rising expenditures, each private provider was required to submit a treatment plan to the Oklahoma Foundation for Medical Quality ("OFMQ"), an independent, non-profit foundation; CMHCs were not subject to preapproval of treatment plans. OFMQ's primary responsibility is to vet individual treatment plans under a set of objective "medical necessity" criteria. Plans were approved on the basis of an authorized number of units, each of which represented a certain amount of a specific type of therapy or rehabilitation. Units were not priced uniformly across therapies – for example, the reimbursement rate for a unit of individual counseling was $27.23 during the relevant period as against $5.63 for a unit of group rehabilitation. Total reimbursement for each patient depended on the number and type of units OFMQ approved (and on whether the provider in fact billed all approved units for each patient).

services; defendants opposed it.

On February 6, 2001, Evans, SOFS, and certain SOFS patients filed suit under 42 U.S.C. § 1983 against the defendants, Lynn Mitchell, OHCA State Medicaid Director, and members of the OHCA Board in their official capacities. That suit alleged unlawful termination of SOFS' Medicaid contract, unlawful denial of requests for reimbursement, and First Amendment retaliation. Those plaintiffs sought injunctive relief, compensatory damages, and certification of a class action.[4] On April 10, 2001, Rustling Winds and the other plaintiffs filed a similar § 1983 action against the defendants, Mitchell, members of the OHCA Board in their official capacities, and OFMQ.[5] The district court consolidated those actions on May 15, 2002. Plaintiffs filed a third amended complaint on June 25, 2002.

All plaintiffs went to trial on April 14, 2003, solely on their § 1983 First Amendment retaliation claim.[6] Over the course of the trial, plaintiffs presented

_____

[4] The court granted injunctive relief in that case, preventing the termination of SOFS' Medicaid contract. We affirmed. See Evans v. Fogarty, 44 F. App'x 924 (10th Cir. 2002).

[5] Several parties in the Rustling Winds litigation are no longer part of this case. Various original plaintiffs have dropped out and plaintiffs' claims against OFMQ were later dismissed. Mitchell, and a subsequently added defendant, Jana Webb, were granted judgment as a matter of law ("JMOL") at trial. Neither of those orders is before us on appeal

[6] Pre-consolidation, the Evans and Rustling Winds district courts separately granted defendants' motion to dismiss as to all claims other than plaintiffs' First

(continued...)

6

evidence in support of several alleged patterns of retaliation, each of which, they argued, sufficed to prove their claim against all three defendants. Plaintiffs first testified that defendants, particularly Fogarty and Brown, spoke to plaintiffs on numerous occasions in rude, threatening, and demeaning terms. Second, they stated that defendants singled out some of the plaintiffs for "retaliatory" audits by the Surveillance Utilization Review Subsystem ("SURS") unit within OHCA, which was responsible for auditing Medicaid recipients throughout the state. Third, plaintiffs alleged that defendants directed OFMQ to reduce their reimbursement rates by rejecting requests for higher value units, and further directed OFMQ to impose greater administrative burdens on them. Fourth, plaintiffs claimed that defendants prevented them from receiving their share of the supplemental appropriations approved by the Oklahoma legislature in 2000. They provided evidence showing that non-politically active providers received, on average, higher reimbursement rates per unit of service.

The jury returned a verdict in favor of all plaintiffs and against all defendants in the amount of $33,095,000, and returned a subsequent punitive damages verdict in the amount of $1,350,000. Of the compensatory damages, $24 million was awarded to the various corporate plaintiffs, and the remainder was awarded to the various individual plaintiffs. All compensatory damages were

---

[6](...continued)
Amendment retaliation claim.

7

allocated between defendants according to the same ratio – 60 percent from Fogarty, 30 percent from Fritz, and 10 percent from Brown. Punitive damages were awarded in the amount of $50,000 for each individual plaintiff against each defendant. Following the verdict, the court considered defendants' motions for JMOL under Fed. R. Civ. P. 50(b).[7] On July 9, 2003, it entered an order denying JMOL to Fogarty and Fritz as to all plaintiffs, and granting JMOL to Brown, but only as to the corporate plaintiffs and Holcomb. In the same order, the court denied plaintiffs' request for injunctive relief against members of the OHCA Board of Directors. That denial is not before us on appeal.

Defendants then filed renewed motions for JMOL and, in the alternative, a new trial or remittitur. On August 25, 2003, the district court granted defendants' motion for a new trial, vacating judgment in the first trial [hereinafter "new trial order"]. The new trial order specifies two primary justifications for vacating the judgment: (1) "[T]he evidence tending to show retaliation against plaintiffs by any of the defendants was extraordinarily thin"; and (2) There was no proper evidentiary basis for either the amount or allocation of the jury's damages awards. Evans v. Fogarty, No. CIV-01-0252-HE, slip op. at 3 (W.D. Okla. Aug. 25, 2003).

---

[7] Defendants moved for JMOL under Rule 50(a) at the close of plaintiffs' case. Although the district court denied those motions as to Fritz, Fogarty, and Brown at that time, there is some ambiguity in the record as to whether it allowed supplemental briefing on those motions post-trial, or considered the post-verdict motions solely under Rule 50(b).

8

With regard to the first ground, the court stated:

> [M]uch of the evidence offered to establish retaliatory activity by defendants Fogarty, Fritz and Brown bordered on pure speculation and, in some instances, was based on little more than proof that the particular defendant was a supervisor of some activity at OHCA. . . . While the evidence here was sufficient to raise a jury question as to the potential liability of these defendants, that evidence was far from compelling.

Id. With regard to the second ground, the court stated: "[E]ach plaintff had the burden of establishing not only that plaintiff's entitlement to relief but also the amount of damages that plaintiff had suffered. Here, plaintiffs made no effort to quantify the economic losses of each corporate plaintiff." Id. at 4. It further stated that with respect to the corporate plaintiffs, "[t]he appropriate measure of damages in this case was the lost profits – not lost gross revenues – of the plaintiffs due to defendants' alleged retaliatory actions. . . . Plaintiffs' 'disparity' evidence, to the extent that it proved anything, showed the loss in gross revenues the plaintiffs arguably had from the alleged differential treatment." Id. at 5.

A second trial was held from September 15-23, 2004. Although the evidence offered by the parties at the second trial varied somewhat from that offered at the first, plaintiffs alleged the same patterns of retaliatory behavior. Defendants filed a motion for summary judgment based on qualified immunity in advance of the second trial, and reasserted that defense in subsequent motions for

9

JMOL.[8]  The district court denied that motion in an order dated December 3,

2003, stating:

> This case has already gone to trial once.  The pretrial order entered
> in the case did not preserve or assert the defense of qualified
> immunity.  While a second trial need not necessarily involve the
> same witnesses and proof, the Court concludes it is inappropriate . . .
> to permit defendants to raise new and different legal issues or
> defenses not at issue in the first trial.

Evans v. Fogarty, No. CIV-01-0252-HE (W.D. Okla. Dec. 3, 2003).  Defendants

appealed from this order, and we dismissed their appeal for lack of jurisdiction.

See Evans v. Fogarty, 123 F. App'x 863 (10th Cir. 2005).  Additionally,

defendants unsuccessfully objected, in advance of the second trial, to the

testimony of plaintiffs' expert witness Dale McDaniel.  This was in contrast to the

first trial, at which McDaniel testified largely without objection.

At the close of the second trial, the jury found for all plaintiffs against

Fogarty in the amount of $1,020,000 for the individual plaintiffs and $14,295,000

for the corporate plaintiffs.  As to Fritz, the jury found for her against all

plaintiffs except Holcomb and his company, JCH, returning verdicts in their favor

for $250,000 and $325,000 respectively.  As to Brown, the jury found against her

as to only two plaintiffs, Neal and Nancy Thrift, returning verdicts for them of

---

[8] Defendants failed to raise an affirmative defense of qualified immunity in the Final Pretrial Report before the first trial, or their motions for JMOL before or after the first trial.  Brown alone raised the defense of qualified immunity in her post-trial motion for JMOL.

10

$25,000 each. After a second bifurcated punitive damages proceeding, the jury awarded a total of $300,000 in punitive damages to the corporate providers against Fogarty, $7500 to JCH against Fritz, and $500 to each of the Thrifts against Brown.

Following the verdict, defendants renewed their motions for JMOL, which the district court granted in part and denied in part on February 23, 2005. Evans v. Fogarty, No. CIV-01-0252-HE (W.D. Okla. Feb. 23, 2005). In its order, the court reaffirmed many of the doubts it expressed in the new trial order and its order granting partial JMOL following the first trial. At heart, the court found plaintiffs' evidence to be almost entirely conjectural as to causation:

> The Court concludes that merely showing that a defendant is the head of an agency or an agency program area, committed unrelated "bad acts," and had serious disputes or disagreements with a plaintiff, combined with evidence that the plaintiff was treated unfavorably by the agency or experienced some sort of undesirable agency action, is not enough, in and of itself, to support an inference that the defendant caused whatever harm the plaintiff objects to.

Id. at 8. More specifically, the court determined that the plaintiffs' most fully-developed theory of retaliation, that defendants directed OFMQ to discriminate against them by rejecting high-rate units, found no support in the record: "There was not . . . evidence from which a jury could have reasonably concluded that these circumstances were due to Fogarty trying to single out and punish the plaintiffs – these facts and circumstances applied to all private providers." Id. at 10. The order identifies at least four discrete breaks in the causal chain with

11

respect to the reimbursement disparity evidence: (1) a lack of evidence suggesting Fogarty, Fritz, or Brown had control over OFMQ approvals; (2) a lack of comparative data indicating the alleged disparity occurred after plaintiffs' political activities began; (3) wide variation in the average monthly reimbursement rate between plaintiffs and other providers (and also among plaintiff providers); and (4) a lack of evidence that plaintiffs provided similar services to other private providers or CMHCs.

On these bases, the court granted JMOL to Fogarty with respect to all the corporate providers and two individual plaintiffs – Mary Parkhurst and Holcomb. Recognizing that § 1983 liability does not extend to defamation, the court nonetheless upheld the jury's verdict against Fogarty in favor of the other individual plaintiffs on the basis of a "defamation plus threat" theory of liability. It held that "defamatory language accompanied by some 'threat, coercion, or intimidation intimating that punishment, sanction or adverse regulatory action will imminently follow,' may support a First Amendment retaliation claim." Id. at 12 (quoting Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 687 (4th Cir. 2000). "Here, although a close question, the Court concludes there was evidence from which the jury could reasonably have found that Fogarty defamed and at least implicitly threatened those plaintiffs present in the meetings [at the state Capitol]." Id. at 13. It granted JMOL to Fritz as to all plaintiffs, finding that the same causal breaks with respect to the disparity evidence and control of OFMQ

12

that applied to Fogarty extended to Fritz. Id. at 31-33. Finally, it denied JMOL to Brown based on the same "defamation plus threat" theory of liability it relied on to uphold some of the individual damages awards against Fogarty. "[T]he jury could have concluded that Brown made defamatory comments about the Thrifts to legislators or others, under circumstances implying that some punishment, sanction or adverse regulatory action would imminently follow." Id. at 35.

On October 4, 2005, the district court entered an order granting plaintiffs a reduced attorneys' fee award pursuant to 42 U.S.C. § 1988(b). Fees and costs were awarded to the plaintiffs in the amount of $356,749.40 against Fogarty and $60,500 against Brown.

Plaintiffs now appeal from the district court's February 23, 2005 order granting in part and denying in part defendants' motions for JMOL. They seek reinstatement of the first jury verdict in full or, in the alternative, reinstatement of the second jury verdict in full. Defendants Fogarty and Brown cross-appeal from the same order, seeking JMOL as to all plaintiffs. Plaintiffs also appeal from the district court's October 4, 2005 order granting a reduced fee award. In their fee appeal, they seek reimbursement for all fees and costs associated with this litigation. Defendants cross-appeal, arguing that the fee award should be reduced further, or eliminated entirely. We have consolidated the merits appeals (docket numbers 05-6106, 05-6109, 05-6110, 05-6112, 05-6122, and 05-6130) and fee appeals (docket numbers 05-6358, 05-6359, and 05-6361) for purposes of

13

disposition.

## II

Plaintiffs appeal from the district court's grant of partial JMOL following the second trial, which we review de novo, viewing all evidence in the light most favorable to the plaintiffs. Herrera v. Lufkin Indus., Inc., 474 F.3d 675, 685 (10th Cir. 2007). Under Fed. R. Civ. P. 50 the district court may grant JMOL if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Defendants Fogarty and Brown cross-appeal from the same order, arguing that JMOL should be granted as to all plaintiffs. "We review de novo a district court's denial of a motion for judgment as a matter of law." Marshall v. Columbia Lea Reg'l Hosp., 474 F.3d 733, 738 (10th Cir. 2007) (citation omitted). "In order to reverse the trial court's decision on a motion for directed verdict, we must find the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." Mason v. Texaco, Inc., 948 F.2d 1546, 1554 (10th Cir. 1991) (quotation and alteration omitted).

However, the unusual procedural posture of this case requires that we first assess plaintiffs' argument that the district court abused its discretion in granting defendants a new trial under Fed. R. Civ. P. 59. Thus far, plaintiffs have not been heard on this argument, as an order granting a new trial under Rule 59 is interlocutory, and thus is not a final decision from which an appeal may be taken

14

under 28 U.S.C. § 1291. See Allied Chem. Corp. v. Daiflon, Inc., 449 U.S. 33, 34 (1980). We review a trial judge's decision on a motion under Rule 59 for abuse of discretion. See Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 433-35 (1996) (holding appellate review for abuse of discretion does not violate party's Seventh Amendment right to a trial by jury); Frank v. Bloom, 634 F.2d 1245, 1254-55 (10th Cir. 1980). Yet when appellate review is of a district court's grant of a new trial, we subject that decision to more stringent scrutiny in order that the district court's judgment not be substituted for the jury's. See Holmes v. City of Massillon, 78 F.3d 1041, 1047 (6th Cir. 1996); Hutchinson v. Stuckey, 952 F.2d 1418, 1420-21 (D.C. Cir. 1992); Lind v. Schenley Indus., Inc., 278 F.2d 79, 90 (3d Cir. 1960). "This is particularly true when the motion is granted on the ground that the verdict is against the weight of the evidence." Hutchinson, 952 F.2d at 1421. In those instances, "[s]uch a close scrutiny is required in order to protect the litigants' right to jury trial." Id. (quotation omitted).

## III

Central to the district court's decision to grant a new trial was its view that "the evidence tending to show retaliation against the plaintiffs by any of the defendants was extraordinarily thin." Evans v. Fogarty, No. CIV-01-0252-HE, slip op. at 3 (W.D. Okla. Aug. 25, 2003). Accordingly, our review of the new trial order necessitates that we consider the sufficiency of plaintiffs' evidence at the first trial as to each defendant.

15

Plaintiffs brought suit against defendants under § 1983, alleging they suffered retaliation related to their exercise of First Amendment rights. "Although retaliation is not expressly discussed in the First Amendment, it may be actionable inasmuch as governmental retaliation tends to chill citizens' exercise of their constitutional rights." Perez v. Ellington, 421 F.3d 1128, 1131 (10th Cir. 2005) (citation omitted).[9] Outside the public employment context,

---

[9] Government officials sued for First Amendment retaliation typically assert the affirmative defense of qualified immunity, in which case plaintiffs must also prove that "the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions." Mitchell v. Forsyth, 472 U.S. 511, 528 (1985); see also Perez, 421 F.3d at 1131. In this case, defendants failed to properly raise a qualified immunity defense in advance of the first trial. Pre-consolidation, defendants moved under Fed. R. Civ. P. 12(b)(6) to dismiss both the Rustling Winds and Evans lawsuits, raising qualified immunity in those motions. Those motions were denied, and defendants then failed to assert qualified immunity in their motions for summary judgment, the pretrial order, or in their oral motions for JMOL at the close of the plaintiffs' case. Under these circumstances, we deem the defense waived. "[C]laims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the [pleadings]." Wilson v. Muckala, 303 F.3d 1207, 1215 (10th Cir. 2002); cf. Maestas v. Lujan, 351 F.3d 1001, 1010 (10th Cir. 2003) (holding defense not waived when defendant "raised qualified immunity as an affirmative defense in his Answer, referenced the defense in the Pretrial Order, and gave testimony on the matter at trial"). Although the defense of qualified immunity provides public officials important protection from baseless and harassing lawsuits, it is not a parachute to be deployed only when the plane has run out of fuel. Defendants must diligently raise the defense during pretrial proceedings and ensure it is included in the pretrial order. "To find otherwise is to invite strategic use of the defense by defendants who stand to benefit from delay." Guzman-Rivera v. Rivera-Cruz, 98 F.3d 664, 668 (1st Cir. 1996). Because we reinstate portions of the first jury verdict, we need not address defendants' argument that the district court abused its discretion in denying their request to assert qualified immunity at the second trial.

16

plaintiffs must prove the following elements to establish a retaliation claim:

> (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.

Worrell v. Henry, 219 F.3d 1197, 1212 (10th Cir. 2000) (quotation and citation omitted).[10]

Parties do not dispute that plaintiffs engaged in protected First Amendment activity. Our review of the evidence from the first trial is thus limited to whether there was evidence of (1) "an injury that would chill a person of ordinary firmness from continuing to engage in [protected] activity," (2) whether

---

[10] We would normally evaluate plaintiffs' retaliation claim under the Pickering/Connick balancing test, which is applicable to parties who have a contractual relationship with the government. See Bd. of County Comm'rs v. Umbehr, 518 U.S. 668, 673-78 (1996). In assessing whether a public employer has impermissibly infringed on an employee's speech rights, we apply the following test: "(1) whether the speech touches on a matter of public concern, (2) whether the employee's interest in commenting on matters of public concern outweighs the interest of the state in promoting the efficiency of the public service it performs through its employees, and (3) whether the protected speech was a substantial or motivating factor behind the adverse employment decision . . . . If these three factors are met, (4) the burden shifts to the employer to establish that it would have reached the same decision in the absence of the protected conduct." Burns v. Bd. of County Comm'rs, 330 F.3d 1275, 1286 n.7 (10th Cir. 2003). We applied this test when considering an earlier appeal from some of the parties in this case. See Evans v. Fogarty, 44 F. App'x 924, 929 (10th Cir. 2002). However, because the juries at both trials were instructed (albeit impermissibly, with the parties' consent) on the elements required to prove a First Amendment retaliation claim outside the public employment context, we apply those elements in this case.

defendants caused that injury, and (3) whether defendants' actions were motivated by plaintiffs' protected activity.  Worrell, 219 F.3d at 1212.  As to the third issue, retaliatory motive, the district court found there was ample evidence of retaliatory motive in its order of July 9, 2003, and did not revisit this point in the new trial order.  See Evans v. Fogarty, No. CIV-01-0252-HE, slip op. at 5 (W.D. Okla. July 9, 2003) ("The Court has little difficulty in concluding there was sufficient evidence to create a jury question as to retaliatory motive.").  Although defendants challenge this holding, we agree that there was sufficient evidence in the record for a jury to find retaliatory motive on the part of all three defendants.  With respect to the causation and injury elements, we must examine the distinct patterns of retaliatory activity alleged by the plaintiffs to determine whether plaintiffs offered evidence as to any one pattern sufficient for a reasonable juror to find in their favor.

As we wade through the evidence presented at the first trial, we reemphasize the Seventh Amendment protections that underpin our inquiry, which provide that "no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."  U.S. Const. amend. VII.  "Thus, under the Seventh Amendment, the court may not substitute its judgment of the facts for that of the jury; it may only grant a new trial if it concludes that the jury's verdict was so against the weight of the evidence as to be unsupportable."  Skinner v. Total Petroleum, Inc., 859 F.2d 1439, 1443 (10th

18

Cir. 1988). It is also worthy of mention that plaintiffs carried a burden to establish the personal participation of each defendant in the alleged retaliation; section 1983 liability may not be predicated on a respondeat superior theory. See Butler v. City of Norman, 992 F.2d 1053, 1055 (10th Cir. 1993) ("A supervisor is not liable under 1983 unless an affirmative link exists between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise.") (quotation omitted).

**A**

Of the several patterns of retaliatory behavior alleged by plaintiffs at the first trial, the most thoroughly developed (and heavily contested) was their allegation that defendants directed OFMQ to approve fewer and lower value units for reimbursement, and to increase costly administrative burdens. In support of this allegation, plaintiffs offered their own testimony, the testimony of several third-party witnesses, and a set of data representing 25 months of reimbursement approvals for all private providers and CMHCs across the state. That data was compiled and analyzed by Roger Dale McDaniel, a certified public accountant who testified as an expert witness at the first trial. McDaniel analyzed monthly reimbursement data provided by Unisys Corporation, OFMQ's fiscal agent, for the months July 1999 through January 2002.[11]

---

[11] Data from July through December 2000, and February 2001 was

(continued...)

For those months included in the Unisys reports, the data shows all units approved for each provider funded through OFMQ. McDaniel testified that, on average, the plaintiff providers (and some providers initially named as plaintiffs but later dismissed) were reimbursed at a lower rate per unit of service than CMHCs and non-plaintiff providers. Across this 25-month period, plaintiff providers were reimbursed at an average rate of $8.85 per unit, other private providers were reimbursed at an average rate of $18.13 per unit, and CMHCs were reimbursed at an average rate of $13.02 per unit (adjusted to $16.93 considering the 30 percent additional reimbursement provided to CMHCs). This disparity in average, across-the-board reimbursement rates was introduced as evidence of retaliatory injury and also as damages evidence with respect to the corporate plaintiffs.

Defendants did not object to McDaniel's qualifications to offer expert testimony on the Unisys data, but did challenge his methodology and conclusions on cross-examination. McDaniel admitted that his calculations represented nothing more than a simple average, not a mean or mode, and that he was unfamiliar with statistical methodologies. He also admitted that the Unisys data included only those units for which each provider was approved, and showed nothing about the quantity or type of units requested, or whether any individual

_____

[11](...continued)
unavailable and was not provided.

20

provider even billed those units for which it was approved. He further admitted that, on average, plaintiff providers billed substantially more per client ($595.01) during that period than either the CMHCs ($393.17)[12] or other private providers ($384.59).

Defendants moved for JMOL at the close of the plaintiffs' case, but did not raise specific objections to the disparity evidence at that time. As to Fritz, defendants stated:

> The testimony over and over and over again by various of the plaintiffs was that every time there was a budget problem at the Health Care Authority that such things as units were reduced or reimbursement rates were cut. But that applied to all private providers across the board. The unit cuts applied to CMHCs and private providers across the board. So what they have shown is that there was a budgetary motive and not a retaliatory motive on behalf of any of the plaintiffs [sic] in this case.

As to Fogarty and Brown, defendants did not mention the disparity evidence. In their motion for JMOL following the verdict, defendants focused on plaintiffs' failure to prove causation – i.e., lack of evidence to prove Fritz or Fogarty exerted any control over OFMQ approvals – but said little about the validity of the disparity evidence as proof of retaliatory injury. In their renewed motion for JMOL or, alternatively, a new trial, defendants discussed the disparity evidence with respect to lost profit damages, but only briefly touched on whether the

___

[12] This figure does not include the premium paid CMHCs to cover administrative costs.

21

disparity evidence could go toward retaliatory injury.

Nonetheless, in its July 9, 2003 order denying JMOL in part, the district court addressed several weaknesses of the disparity evidence in substantially greater detail than found in the defendants' motions for JMOL. It then explicitly referenced that discussion[13] in the new trial order, finding that the disparity evidence was insufficient to support a First Amendment retaliation claim as to any of the defendants. The court concluded that the evidence tending to show liability was "extraordinarily thin." Evans v. Fogarty, No. CIV-01-0252-HE, slip op. at 3 (W.D. Okla. Aug. 25, 2003). With respect to damages, the court found that "[t]he jury's formulaic allocation of damages between each of the defendants was also troublesome." Id. at 5. It determined that the corporate plaintiffs' damages awards were unsupported by the evidence, because they were based on a measure of lost revenues as opposed to lost profits. Individual plaintiffs' damages awards, which ranged from $295,000 to $1.5 million, were deemed excessive.

---

[13] The concerns addressed in the July 9, 2003 order include: (1) variance in reimbursement rates depending on the service provided, (2) lack of evidence showing plaintiff providers requested the same units as other providers, (3) lack of evidence as to uniformity of patient populations, (4) lack of evidence that approved units were in fact used/billed, (5) lack of "comparable statistical evidence regarding the relative reimbursement rates for the period prior to plaintiffs' political activities," and (6) evidence that disparities in reimbursement rates were of concern to plaintiffs even before 1999. Evans v. Fogarty, No. CIV-01-0252-HE, slip op. at 7 (W.D. Okla. July 9, 2003)

22

Although, as discussed infra, we share the district court's concerns about the corporate damages awarded at the first trial, we hold that it abused its discretion in granting a new trial. Taken in the context of all other evidence produced at trial, a reasonable juror could have found both retaliatory injury and causation. In its discussion of this evidence in the July 9, 2003 and new trial orders, the district court improperly intruded on the jury's primary role as factfinder and substituted its own judgment for that of the jury.

Our review of the evidence admitted at the first trial satisfies us that a reasonable juror could have found Fogarty and Fritz caused OFMQ to approve fewer and/or lower value units. Recognizing that "[i]ndividual liability under § 1983 must be based on personal involvement in the alleged constitutional violation," Foote v. Spiegel, 118 F.3d 1416, 1423 (10th Cir. 1997) (citation omitted), there was sufficient evidence of Fritz and Fogarty's personal control over OFMQ to establish causation.

Fogarty testified via deposition that "we directly control [OFMQ] as a contractor" and "we write the terms of the contract and they agree to it." Charles Parkhurst, owner of DFS, testified that he spoke with Fogarty regarding certain units that Parkhurst felt were unfairly denied by OFMQ. According to Parkhurst, Fogarty agreed that the units should be restored, and that he would personally resolve the issue with a phone call to OFMQ. When asked whether Fogarty indicated that "with a simple phone call to OFMQ he could control your units,"

23

Parkhurst replied, "Yes. That's what he told me." In fact, the contract in place between OHCA and OFMQ during this period provides for relatively close supervision of the OFMQ approval process by OHCA:

> The parties agree to discuss at a minimum of one weekly meeting any problems or concerns relating to [prior authorization] services.

> OFMQ agrees to provide a half time data analyst to assist the OHCA and the OFMQ prior authorization program in analyzing and studying utilization patterns of providers and recipients of outpatient behavioral health services.

By contrast, there is no provision in the contract for OFMQ's independence with regard to prior approval of reimbursement plans.

Fritz testified that she spoke with OFMQ staff regularly, and that when an individual provider raised a concern, she would occasionally call OFMQ to discuss what happened in that particular instance. OHCA Finance Director Deborah Ogles testified that Fritz was the "go-between" between OFMQ and senior executives at OHCA. OFMQ's Outpatient Behavioral Health Manager, Kirk Nicholson, testified that Fritz was his principle contact within OHCA, and that he touched base with her once per week. John Majors testified that he witnessed Fritz kick an OFMQ employee under the table during a meeting to indicate that a provider's question was best left to her.

Moreover, there was evidence suggesting that Fritz, and to a lesser extent Fogarty, had an exquisite understanding of the relationship between the unit mix approved by OFMQ and overall outlays for behavioral and mental health services.

24

For example, in an April 7, 1999 letter from Fritz to Sean Black discussing the potential cost impact of House Bill 1075, Fritz wrote:

> The assumption is that if the providers are able to use their bachelor trained employees to provide the more expensive counseling services instead of the lesser reimbursed rehab services there will be a significant tendency to do so. . . . If HB1075 were enacted the OHCA could anticipate very little use of the Individual Rehab treatment and continuing high use of the counseling units.

In a memo laying out what plaintiffs refer to as the "four point plan," Fritz describes OFMQ's role as "slow[ing] down" the growth of private provider services, and states that downward adjustment of rates was intended to "eliminate providers and services." By crediting these statements, a reasonable juror could surely draw the inference that Fritz and Fogarty exercised tight supervisory control over OFMQ and closely tracked private provider reimbursements.

Coupled with other evidence adduced at trial, jurors could also reasonably rely on the disparity evidence as proof of retaliatory injury. Plaintiff providers testified that they serviced the same population of patients as CMHCs and other private providers. Charles Parkhurst testified to fairly regular movement of patients back and forth between DFS and a nearby CMHC. Several third-party witnesses corroborated that testimony. Linda Coffman, a licensed professional counselor at SOFS, testified that she could discern no difference between the patient population she serviced at her prior employer, a local CMHC, and that serviced by SOFS. Michael Elder, an attorney and one-time consultant to OHCA,

25

testified that the services provided by CMHCs and private providers were "all the same." Nicholson testified that "[t]he same type of services as far as what they can provide are available between the two different – the privates and public facilities."

Although plaintiffs did not produce pre-1999 data, and thus could not show that the reimbursement disparity widened after they formed the Association, jurors could have relied on plaintiffs' testimony that the number and type of units approved changed after they began lobbying. Mary Parkhurst testified that she noticed a change in OFMQ treatment approvals at DFS in late 1999 through early 2000. Evans testified that after the Association began lobbying at the Capitol, "OFMQ got a little tougher to deal with." John Majors testified that in the Spring of 1999, "when we began to really speak out and ask for accountability OFMQ began to crack down and adjust. And almost like clockwork, when there would be a big issue at the capitol . . . my therapists would say sounds like you all spoke out today, because we're getting rejections, lowering units, major adjustments to our treatment plans." Neal Thrift testified that soon after the Association began lobbying, "we [were] not given as many units for the counseling services." Charles Parkhurst testified that in 2000, "[w]e started getting a lot of modifications downward. We started getting a lot of requests for information. We got more technical denials. It turned into a nightmare."

Furthermore, there was at least some evidence that OHCA increased

26

administrative burdens on plaintiff providers during this period. Holcomb testified that soon after joining the Association he noticed a delay in prior approvals. He also testified that during the process of getting Commission on Accreditation of Rehabilitation Facilities ("CARF") accreditation for JCH, one of the auditors spoke with someone at OHCA. Immediately thereafter, the auditors at his facility identified new problems. He further testified to receiving a call from Fritz telling him that he had not been accredited, before he himself had been notified of that fact by CARF.

Jurors could also have drawn the rational inference that plaintiff providers had an incentive to request higher value units, and did in fact request such units. William Schmid, a clinical psychologist, testified that the private providers worked off of a fixed cost base, and thus had a strong incentive to keep their clinicians providing therapy, and, ideally, higher value units of service. "[Y]ou really can't make up a loss on volume. I've tried; it doesn't work."

None of this is to refute the validity of the district court's concerns with respect to the admittedly imperfect disparity evidence derived from the Unisys data and testified to by McDaniel. Viewing the trial record as whole, a reasonable juror could conclude that Fogarty and Fritz moved aggressively in response to a severe budget crisis, but that all policy changes designed to reign in costs applied to private providers across the board, and that they did not have the means to target the plaintiff providers even if they wished to. Yet a reasonable

27

juror could also come to the opposite conclusion – that Fogarty and Fritz were persistently hostile to the plaintiff providers, whom they viewed as damaging to OHCA's interests, and used their authority to single out plaintiff providers for discriminatory treatment. Accordingly, the district court abused its discretion in taking that determination away from the jury.[14]

**B**

Plaintiffs argued that in addition to directing OFMQ to scale back on reimbursements to plaintiff providers, defendants used their authority to increase the number and intrusiveness of OHCA audits of their facilities. They also alleged that OHCA demanded larger recoupments of previously billed services after they began lobbying at the Capitol. The SURS unit at OHCA was responsible for identifying suspicious and potentially fraudulent billing at

---

[14] In many ways, comparing this case to our decision in Butcher v. City of McAlester, 956 F.2d 973 (10th Cir. 1992), is instructive. In that case we reviewed the district court's denial of judgment notwithstanding the verdict to several city employees in a § 1983 First Amendment retaliation suit brought by members of a local firefighters' union. Defendants argued that much of the evidence was circumstantial and speculative, and that little if any evidence went to personal participation. Id. at 976-77. We upheld the judgment in favor of the plaintiffs, noting that "in a § 1983 proceeding circumstantial evidence generally plays a major role." Id. at 978. We further noted that the evidence, circumstantial though it may have been, was set against a backdrop of "intense emotional conflict between the City and Local 2284." Id. Similarly, in this case there was ample evidence of a poisonous, long-running political battle between plaintiffs and defendants, and that backdrop was insufficiently accounted for in the district court's piecemeal treatment of plaintiffs' disparity evidence as well as other evidence presented at trial.

28

numerous Medicaid-funded facilities, including those providing behavioral and mental health services. Webb, SURS's Director, testified that her unit's audit decisions were based on a combination of referrals and objective criteria run through a statistical program to spot suspicious billing patterns. Webb, Fritz, and Fogarty all denied that any audits performed by the SURS unit were retaliatory.

In its discussion of this evidence in the July 9, 2003 order, the district court found the retaliatory audit evidence sufficient to create a jury question, albeit barely:

> Evidence as to the timing and severity of [OHCA]'s audits of plaintiffs, taken in the light most favorable to plaintiffs and giving them the benefit of all reasonable inferences, might support an inference that some aspect of the audits was retaliatory. Any evidence suggesting such retaliation was purely circumstantial though and, as with the evidence relating to other instances of claimed retaliation, extraordinarily thin.

Evans v. Fogarty, No. CIV-01-0252-HE, slip op. at 12 (W.D. Okla. July 9, 2003). The court did not revisit this alleged pattern of retaliation in its new trial order, in part because it found that the jury's damages awards at the first trial must have hinged on the disparity evidence.

Although we share the district court's skepticism about the evidence offered with respect to retaliatory audits, a reasonable juror could have found for Charles and Mary Parkhurst and their facility, DFS, as against Fritz based on the evidence presented. Mary Parkhurst testified that DFS was audited by the SURS team in March 2002, and that she received an unusually large recoupment request,

29

amounting to $16,000, soon thereafter.  Charles Parkhurst testified that the basis for the recoupment decision was never explained to him.  Fritz admitted that she complained to the SURS unit about DFS.  This evidence, taken in conjunction with testimony showing the contentious relationship of the parties, could lead a reasonable juror to conclude that Fritz personally participated in the decision to audit DFS and that her motive in making that referral was retaliatory.

With respect to the remainder of the audit evidence, it was simply too speculative to prove personal participation or causation as to any of the defendants.  Evans testified that immediately after serving an open records request he was hit with two unusually invasive audits of his facility, SOFS.  He also testified that he received the results from those audits unusually quickly, and that the result of a November 27, 2000 audit was hand-delivered.  Yet in light of overwhelming evidence of multiple problems at SOFS, undisputed evidence that OHCA received several referrals from employees of SOFS, and the lack of any evidence linking any of the defendants to the SOFS audits, no reasonable juror could have found for Evans or SOFS on this basis.  Audit-related testimony from Neal Thrift and John Majors was also speculative and could not form a basis for liability.

### C

In addition to the audit and disparity evidence, plaintiffs introduced evidence at the first trial that defendants had blocked plaintiff providers from

receiving their share of two supplemental appropriations approved by the Oklahoma state legislature in early 2000. The first appropriation amounted to $500,000, and was passed in February 2000; the second, amounting to $1.1 million, was passed in March 2000. Considering federal matching funds, these appropriations provided $5.2 million in additional funding. In its July 9, 2003 order, the district court found that the evidence relating to the supplemental appropriation created a jury question on plaintiffs' claim:

> Plaintiffs testified that, although they were successful in obtaining passage of the supplemental appropriation, none of them received any restored units. Defendant Fritz testified that restoration of units was done on a case-by-case basis, depending apparently on whether it was requested in a particular case. It was unclear from plaintiffs' evidence whether plaintiffs sought such restorations and were denied them, or whether they simply assumed the restorations would be across the board and therefore did not pursue reimbursements in each affected case. However, considering the evidence in the light most favorable to plaintiffs and drawing all reasonable inferences therefrom, the Court concludes the evidence was sufficient to create a jury question as to whether, in some fashion, defendants Fogarty and/or Fritz retaliated against plaintiffs by somehow denying them any portion of the units restored by the supplemental appropriation.

Evans v. Fogarty, No. CIV-01-0252-HE, slip op. at 8-9 (W.D. Okla. July 9, 2003). We agree that the supplemental appropriation evidence created a question of fact for the jury and that a reasonable juror could have found against Fritz and Fogarty on this basis.

Several of the plaintiffs, including Nancy Graves-Thrift, Evans, John Majors, and Wheeler, testified that none of the supplemental appropriation was

allocated to their facilities via restoration of units previously cut. They alleged that this funding, which was allocated to the OHCA general fund, was withheld from them in retaliation for their political activities. This testimony is supported by a letter from State Senator Cal Hobson to Fogarty, dated August 22, 2000. That letter reads in part:

> The case has been convincingly made to me that despite a formal restoration in the maximum number of allowable services, in practice [OFMQ] has been systematically and almost universally rejecting requests to authorize services back up to the traditional levels. Instead, they have been holding patients at or below the reduced limits set while the cuts were in place.

Other evidence, in addition to the Hobson letter, showed that this was a matter of heated dispute between OHCA and the Association, and that the Association met with Fogarty on the issue. At this meeting Fogarty said OHCA would not support the supplemental appropriation.

With respect to causation, Wheeler testified that Fogarty assured him he would look into the restoration of units at Wheeler's facility, and assured him the money would find its way into the providers' pockets. Fritz testified that the supplemental appropriation resulted in restoration of units to providers, but that those units were restored "on a case-by-case basis." In light of other evidence in the record, including evidence that Fritz and Fogarty supervised OFMQ approvals to private providers, a reasonable juror could find against Fritz and Fogarty on the basis of this evidence.

32

**D**

Plaintiffs alleged a fourth pattern of retaliation, specific to SOFS. They claimed that SOFS' Medicaid contract was terminated in January 2001 in retaliation for Evans' political activities. Specifically, plaintiffs alleged that Fritz and Fogarty retaliated against Evans by terminating his contract soon after Evans sent Fogarty a disclosure request under the Open Records Act. See Okla. Stat. tit. 51, § 24A. Evans sent that request on November 22, 2000. He received a letter from Fritz dated January 8, 2001, notifying him that his contract had been terminated. The district court found in its July 9, 2003 order that there was sufficient evidence on this question to create a triable issue of fact for the jury: "Finally, the evidence showed the medicaid contract of [SOFS] was not renewed, which is actionable, adverse action as to it." Evans v. Fogarty, No. CIV-01-0252-HE, slip op. at 12 (W.D. Okla. July 9, 2003). The record includes evidence showing problems at SOFS. Evans hid his involvement with SOFS in violation of both OHCA rules and his Medicaid contract. It is also fairly clear there were persistent billing problems at SOFS facilities. However, we agree that a reasonable juror could have found the termination retaliatory.

There was ample evidence from which a reasonable juror could conclude that Evans' political activities were irritating to Fritz and Fogarty. Multiple communications reveal the battle Evans waged with OHCA and several OHCA documents demonstrate that OHCA paid close attention to SOFS. Furthermore,

33

some evidence suggested that Fritz and Fogarty were personally involved in the termination decision. An internal OHCA document showed that Fogarty was personally involved in a decision to hold SOFS' termination in abeyance following a state representative's request to keep SOFS' facilities open. Accordingly, a reasonable juror could have found the termination decision to be retaliatory.

E

Plaintiffs expended substantial time at the first trial offering evidence of allegedly hostile, defamatory, and threatening comments made to individual plaintiffs by Fogarty and Brown. The district court relied on this evidence to deny JMOL to Brown and Fogarty as to all individual plaintiffs except Holcomb (who did not actively lobby before the state legislature), relying on Suarez. It recognized that federal courts have historically been chary of extending § 1983 liability to defamation, see Paul v. Davis, 424 U.S. 693, 702 (1976), but held that a § 1983 claim may succeed if defamation is "coupled with some threat, sanction or similar retaliatory action." Evans v. Fogarty, No. CIV-01-0252-HE, slip op. at 12 (W.D. Okla. July 9, 2003). Without reaching the question of whether we find Suarez persuasive, we discern no basis in the record for holding Fogarty or Brown liable because of their comments to plaintiffs.

Nancy Graves-Thrift testified that, while she was in a public restroom at the state Capitol, Brown said: "[Y]ou all are wasting your time here. These

34

people can't help you.  We can help you.  You're just making my job harder."

She further testified that Fogarty said to her, "[Y]ou're not helping me, you're

hurting me."  Finally, she testified that she witnessed Brown "flip off" John

Majors (testimony which Majors corroborated).  Charles Parkhurst testified that

while he stood outside a committee room at the Capitol, Fogarty asked him,

"What can we do to make [House Bill] 1075 go away?"  Cynthia Majors testified

Fogarty threatened that if her husband John Majors continued to lobby at the

Capitol, "he could send someone down to investigate [her] nursing home for

fraudulent billing."  Gerrol Adkins, Cynthia Majors' father, corroborated her

testimony on this point.  John Majors testified that he attended a meeting with

Fogarty and various state legislators at which Fogarty labeled the members of the

Association "frauds and crooks."  Finally, Evans testified that he spoke to Fogarty

on the phone while at the Capitol and Fogarty asked, "Do you think you could

talk to your group and see if you could get them to stop trying to get this House

Bill 1075 passed?"

In Paul, the Court held that injury to reputation, alone, is insufficient to

establish a deprivation of a plaintiff's Due Process rights.  424 U.S. at 712.

Rather, plaintiffs must show that a "right or status previously recognized by state

law was distinctly altered or extinguished."  Id. at 711; see also Siegert v. Gilley,

500 U.S. 226, 234 (1991).  Accordingly, defendants' comments, even if

defamatory or hostile, cannot form the basis for a § 1983 action absent some

35

ancillary change in plaintiffs' status (i.e., injury), which plaintiffs failed to demonstrate. See Hardeman v. City of Albuquerque, 377 F.3d 1106, 1118-19 (10th Cir. 2004) ("We have never found a First Amendment violation on the basis of disparaging comments alone.").

On the other hand, threats of official sanctions aimed at discouraging protected activity can form the basis of a constitutional violation. See Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 67 (1963). Yet no reasonable juror could find that any of the alleged comments, with one possible exception, could constitute a threat that would "chill a person of ordinary firmness." Worrell, 219 F.3d at 1212. Nor is Suarez on point. In that case a defendant told plaintiffs that it would "become his mission to cause as much pain, damage, and injury as possible to [them]." 202 F.3d at 680. He further threatened that he would "inflict the maximum degree of penalty" if plaintiffs refused to agree to a temporary injunction. Id. While the statements alleged to have been made by defendants in this case evince a level of discourse that falls well short of our public ideals, none of the comments are analogous to the specific threats at issue in Suarez.

The one possible exception to this analysis is the alleged threat made by Fogarty to Cynthia Majors. While we are skeptical that the phone call between Fogarty and Cynthia Majors could be construed as an "imminent [threat of] adverse regulatory action," see Blankenship v. Manchin, 471 F.3d 523, 529 (4th Cir. 2006), we need not reach the issue. The jury could have imposed liability on

36

Fogarty with respect to Cynthia Majors and her facility, Morning Star, based on the other alleged patterns of retaliation. See Part III.A supra. Cynthia Majors' membership in the Association includes her in the group of plaintiffs that have established political activity on the facts of this case. Evidence of causation and injury are discussed above.[15]

Accordingly, we conclude it was error for the district court to deny JMOL to Brown as to all plaintiffs following the first trial. The district court based its denial to Brown on her comments labeling some of the defendants "crooks" and "frauds," holding that "[s]uch comments, if made, arguably go beyond the scope of that which the First Amendment protects." Evans v. Fogarty, No. CIV-01-0252-HE, slip op. at 11 (W.D. Okla. July 9, 2003). Yet for the reasons stated above, such comments are at most defamatory, and do not, standing alone, provide a basis for recovery in a § 1983 action.[16] As to the other patterns of retaliation discussed in the preceding sections, plaintiffs offered no evidence that Brown had any authority with respect to OFMQ or the SURS unit, or that she

_____

[15] Defendants argue on appeal that Oklahoma's two-year statute of limitations for § 1983 claims, see Okla. Stat. tit. 12, § 95, bars recovery on the basis of the Cynthia Majors call, because that call occurred in March 1999. Because defendants did not raise this defense below, however, we consider it waived. See Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 703 F.2d 1152, 1171-72 (10th Cir. 1981).

[16] We take no position on whether the terms "crooks" and "frauds," used in this context, were in fact defamatory, as opposed to words of general disparagement or abuse. We also note, for the sake of clarity, that the evidence is ambiguous as to whether these remarks were attributed to Brown or Fogarty.

37

personally participated in that retaliatory activity. Plaintiffs' claims against

Brown are unsupported by the evidence, and are properly dismissed as a matter of

law.[17]

## IV

Defendants argue that even if the evidence at the first trial were sufficient

to support a finding of liability, damages to both the corporate and individual

plaintiffs were "so excessive as to shock the judicial conscience and to raise an

irresistible inference that passion, prejudice, corruption or improper cause

invaded the trial," see Fitzgerald v. Mountain States Tel. & Tel. Co., 68 F.3d

1257, 1261 (10th Cir. 1995), and, in the case of the corporate plaintiffs, without

any economic basis.[18] The amount of damages awarded at the first trial, both to

---

[17] Plaintiffs argue that Brown waived her challenge to the denial of JMOL after the first trial by insufficiently specifying the grounds for JMOL in her Rule 50(a) motion. Although plaintiffs' response to Brown's motion for JMOL took issue with Brown's testimony on many grounds, including her "flagrant disregard for the truth and constant willingness to say anything to promote half truths or non-truths," it says nothing in regard to preservation of this issue. Therefore plaintiffs may not now argue waiver on the part of Brown, having waived this objection themselves. See Guides, Ltd. v. Yarmouth Group Prop. Mgmt., Inc., 295 F.3d 1065, 1076 n.3 (10th Cir. 2002).

[18] Both Fritz and Fogarty limit their specific damages challenges to the second trial verdict. Fogarty's entire argument in his principal brief with respect to the damages awarded at the first trial is a paragraph addressing the propriety of the new trial order, not the awards themselves. Fritz's argument on this point in her principal brief is similarly skeletal – she devotes all of four lines to the matter, none of which preserve specific objections or mention specific plaintiffs. This would normally constitute waiver as to the damages awarded at the first trial. See Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 679 (10th Cir. 1998)

(continued...)

the corporate and individual plaintiffs, was a matter of concern to the district court, and was a key factor in its granting a new trial. Evans v. Fogarty, No. CIV-01-0252-HE, slip op. at 3 (W.D. Okla. Aug. 25, 2003) ("The sufficiency of the evidence to support the damages awarded in this case is also central to the Court's conclusion that a new trial must be ordered."). The court primarily took issue with the awards to the corporate plaintiffs, finding the jury's allocation of damages to be "formulaic,"[19] and further finding that the awards could not be supported by any plausible measure of lost profits. Id. at 5. It also deemed the individual damages awards to be "plainly excessive." Id. at 6.

Our review of a jury's findings with respect to damages is limited to whether they are supported by substantial evidence. Dodoo v. Seagate Tech., Inc., 235 F.3d 522, 531 (10th Cir. 2000). "[A]bsent an award so excessive or inadequate as to shock the judicial conscience and raise an irresistible inference that passion, prejudice or another improper cause invaded the trial, the jury's

---

[18](...continued)
("Arguments inadequately briefed in the opening brief are waived."). Nevertheless, in light of the unusual procedural posture of this case and the similarity between the first and second trial damage awards, we will consider this issue preserved. See Sussman v. Patterson, 108 F.3d 1206, 1210 (10th Cir. 1997) (holding that the "general waiver rule is not absolute, . . . and we may depart from it in our discretion") (alteration omitted).

[19] Insofar as the district court found that the allocation of individual damages between the defendants raised an inference that passion or prejudice infected the first trial verdict, we note that that allocation of liabilities does not shock the conscience of this court upon review of the evidence.

determination of the amount of damages is inviolate." Id. (quotation and alteration omitted). When an appellate court concludes a damages award was erroneously excessive, but that no error tainted the jury's finding of liability, it may order a remittitur or direct a new trial. See Malandris, 703 F.2d at 1168. With these standards in mind, we turn first to the individual plaintiffs' awards, and then to the corporate plaintiffs' awards.

## A

### 1

In the first trial, the jury awarded Evans $300,000 in compensatory damages as against Fogarty and $150,000 as against Fritz. These sums appear to be at the upper range of emotional damages upheld in this circuit, see Dodoo, 235 F.3d at 532 (affirming emotional damages in the amount of $125,000); Smith v. Nw. Fin. Acceptance, Inc., 129 F.3d 1408, 1416 (10th Cir. 1997) (affirming emotional damages in the amount of $200,000), but on our review of the record, we cannot say that they shock the judicial conscience. Evidence presented at trial allowed the jury to find that Fritz and Fogarty acted to terminate Evans' Medicaid contract, effectively putting him out of business. Evans took the lead for the Association in filing a disclosure request with the OHCA, and some evidence suggested that Evans suffered targeted retaliation as a result of that request. Moreover, Evans testified to engaging in a long-running battle with OHCA officials to keep his facilities open. He stated that his struggles to keep open

40

SOFS facilities left him with a large personal debt, caused him substantial stress over a number of years, and caused him to lose 25-30 pounds. Such testimony supported a finding that he lived in constant fear of retaliation by OHCA against his business.

Contrary to defendants' suggestion, there is no rule in this circuit requiring corroboration of a plaintiff's testimony to support an emotional damages award. See, e.g., Dodoo, 235 F.3d at 532; compare Koopman v. Water Dist. No. 1, 41 F.3d 1417, 1420 (10th Cir. 1994) (denying emotional damages when no witness testimony corroborated plaintiff's mental state, and circumstances afforded no basis to infer stress was caused by a recoverable injury). Nor do we accept Fogarty's argument that Evans' testimony referred solely to economic concerns – rather, Evans' testimony went to emotional distress caused by Fritz and Fogarty's retaliation and was sufficient to support an award of emotional damages.

As to the district court's finding that Wulf v. City of Wichita, 883 F.2d 842 (10th Cir. 1989), set a $50,000 "guidepost" for emotional distress damages, that conclusion misreads our holding. In Wulf we reduced an emotional damages award of $250,000 to $50,000 in a First Amendment retaliation case in which the retaliatory injury was the loss of the plaintiff's job. Id. at 875. Nothing in Wulf contradicts the basic principle that a jury's damages award is highly specific to the facts and circumstances of the case. More generally, it bears repeating that compensation in cases involving constitutional rights should not be approached in

41

a miserly fashion. "It is in the public interest that there be a reasonably spacious approach to a fair compensatory award for denial or curtailment of the right." Foster v. MCI Telecomms. Corp., 773 F.2d 1116, 1121 (10th Cir. 1985). Under that relatively generous standard, and carefully considering the facts of this case, we cannot say that the jury's compensatory damages award to Evans shocks the judicial conscience.

**2**

The jury awarded Wheeler $177,000 in compensatory damages against Fogarty and $88,500 in compensatory damages against Fritz. This award finds no basis in the record. Wheeler did not testify that he suffered any emotional distress, nor could any other evidence introduced at trial support an inference that he suffered such distress. Accordingly, Wheeler failed to prove compensable injury as to any of the defendants, and only nominal damages were appropriate. See Lippoldt v. Cole, 468 F.3d 1204, 1220-21 (10th Cir. 2006) (upholding district court award of nominal damages in a § 1983 action due to plaintiffs' failure to prove compensable injury). We remand the verdict in favor of Wheeler with directions that the trial court enter a remittitur order for acceptance of a judgment of $1 in nominal damages against Fogarty and $1 in nominal damages against Fritz.

**3**

As to the remaining individual plaintiffs, the jury awarded compensatory

42

damages ranging from $450,000 (Cynthia Majors) to $1,350,000 (Neal and Nancy Thrift, individually).[20] With the exception of the Cynthia Majors award, all other individual plaintiffs were awarded at least $900,000. Although all of those awards are supported by at least some evidence that the plaintiff receiving the award suffered emotional distress, we conclude these awards are so excessive as to shock the judicial conscience, and that remittitur is appropriate. As stated supra, our discretion to review jury awards is limited, and our approach is necessarily deferential. Nevertheless, even recognizing the unusual circumstances of this case and the threat defendants posed to plaintiffs' livelihoods, the jury's awards to the remaining individual plaintiffs so far outpace emotional damages awards sanctioned in this and other circuits that we are compelled to order remittitur.

There is precedent in this circuit for an appellate panel to actually set the amount of the remittitur. See Malandris, 703 F.2d at 1178; see also 11 Wright et al., Federal Practice and Procedure: Civil 2d § 2820 ("If the appellate court concludes that the verdict is excessive, it need not necessarily reverse and order a new trial. It may give plaintiff an alternative by ordering a new trial unless plaintiff will consent to a remittitur in a specified amount."). That is the resolution sought by plaintiffs in the event we were to reinstate some or all of the

---

[20] These amounts are net of any damages awarded against Brown.

43

compensatory damages awarded at the first trial. We deny that request.

Notwithstanding our authority to do so, we are reluctant to invade the province of the trial court in setting a remittitur amount, as the panel did in Malandris. The district court has heard all of the evidence, and is in a better position to select the amount of an appropriate remittitur than is this panel. A jury has twice awarded compensatory damages to the individual plaintiffs, and the district court has heard all of that evidence. Having reviewed the record, which is more than 16,000 pages in length, we are convinced that the amount of remittitur should not be so small as to amount to no award at all, nor that the reduction as to any individual plaintiff be unreasonable. There are not many cases in this circuit to guide the district court on this point, but we do note that the panel's reduction in Malandris was two-thirds.

Yet we must qualify our holding with respect to two of the remaining individual plaintiffs – Cynthia Majors and Mary Parkhurst. The only evidence which could support an award of emotional damages in favor of Cynthia Majors was her testimony regarding the Fogarty phone call, and John Majors' testimony that defendants' retaliation had damaged their marriage. Moreover, it was undisputed that Cynthia Majors played a minor role in the Association's lobbying activities and had no role in the day-to-day operation of Morning Star. Her threadbare testimony is quite similar to the plaintiff's testimony in Wulf. Like the court in that case, "we agree with defendants that [although plaintiff's]

44

testimony and the evidence presented are not the most graphic and detailed display of emotional and mental anguish and distress, we cannot conclude that some award for such anguish and distress is unsupported by substantial evidence." 883 F.2d at 875. Accordingly, the standard of reasonableness with respect to the Cynthia Majors award may counsel a reduction greater than that in Malandris.

We reach the same result with regard to the jury's emotional damages award to Mary Parkhurst. She offered testimony that was tangential, at best, to the issue of emotional distress: "Well, I have gray hair now. And it does make – it's very stressful. And I tell you, I feel like a little mouse backed off in a corner with a big cat sitting up there grinning at me ready to pounce any time. That's how we feel because of the threat that we feel. All the time we live with that fear." Like Cynthia Majors' testimony, this evidence is simply too thin to support a large award for emotional distress. Accordingly, the standard of reasonableness with respect to the Mary Parkhurst award may also counsel a reduction greater than that in Malandris. With respect to all individual plaintiffs we hold, like the Malandris panel, that they are free to accept the remittitur ordered by the district court or, in the alternative, to pursue a new trial as to all issues, including liability. See 703 F.2d at 1178.

**B**

Following the jury's verdict in favor of all plaintiffs and against all defendants on liability and compensatory damages, plaintiffs sought punitive

45

damages against all defendants in a second-stage proceeding. Evans, Nancy Graves-Thrift, and John Majors testified during the punitive damages stage, as did Brown, Fritz, Fogarty, and Mitchell. The jury subsequently awarded punitive damages in the amount of $50,000 in favor of all individual plaintiffs against all defendants, for a total punitive damages award of $1,350,000. Defendants challenge these awards as unsupported by the evidence, but do not argue that the amount of the awards constitutes a Due Process violation. See, e.g., State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408 (2003). The district court did not mention the jury's punitive damages awards in the new trial order or in its July 9, 2003 order, but vacated these awards along with all others by granting defendants a new trial.

Punitive damages are available in § 1983 actions, but the burden of proof with respect to punitive damages is higher than that required to find liability. Such damages are only available "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others. The focus must be on whether the defendant's actions call for deterrence and punishment over and above that provided by compensatory awards." Hardeman, 377 F.3d at 1121. As with the other damages awards, we review the sufficiency of the evidence de novo, and examine the evidence in the light most favorable to the plaintiffs. Nieto v. Kapoor, 268 F.3d 1208, 1221 (10th Cir. 2001). We note, however, that

46

we are without the district court's views on the matter.

Nevertheless, we are satisfied that a reasonable juror could conclude that Fritz and Fogarty acted with "reckless or callous indifference," if not "evil motive or intent," to the rights of the defendants. Hardeman, 377 F.3d at 1121. Plaintiffs met with persistent hostility from Fritz and Fogarty, and were subject to a wide variety of injuries in retaliation for their political activities. A reasonable juror could conclude, based on the evidence before it, that Fogarty and Fritz wanted to silence members of the Association, were embarrassed by their lobbying efforts, and acted to starve them of Medicaid funding in an effort to put them out of business. This type of behavior is the sort that is properly answered by punitive damages, which act "to punish what has occurred and to deter its repetition." Youren v. Tintic Sch. Dist., 343 F.3d 1296, 1309 (10th Cir. 2003). Although defendants cite to Fuerschbach v. Southwest Airlines Co., 439 F.3d 1197 (10th Cir. 2006) as analogous to the facts at issue here, we are unconvinced. Defendants conduct in that case, which we described as a "joke gone bad,"[21] see id. 1200, is a far cry from defendants' conduct in this case. Accordingly, we reinstate the punitive damages awarded at the first trial against Fogarty and Fritz in favor of all plaintiffs.

---

[21] In that case, the plaintiff's fellow employees convinced two Albuquerque police officers to conduct a mock arrest of plaintiff as a practical joke. Id. at 1201-02.

47

## C

Finally, we review whether the evidence was sufficient to support the jury's award of compensatory damages to the corporate plaintiffs. These damages amounted to $24 million – $6 million to SOFS, $6 million to Morning Star, $6 million to Rustling Winds, $2 million to JCH, $2 million to DFS, and $2 million to Serenity Springs. As with the individual damages, liability was allocated on a 60/30/10 basis between Fogarty, Fritz, and Brown. Total corporate damages, as well as the allocation of damages between the corporate plaintiffs, were consistent with plaintiffs' counsel's suggestion at closing. That request was itself based, loosely, on McDaniel's testimony. McDaniel's corporate damages calculation represented: (1) the difference between the average per unit reimbursement rate paid to the plaintiff providers and all other private providers during the relevant period, (2) multiplied by the average number of units billed by all plaintiff providers per month, (3) multiplied by the number of months between the beginning of plaintiffs' lobbying efforts and the filing of the Rustling Winds lawsuit, (4) plus interest.

Before the district court, defendants argued that McDaniel's calculations did not provide a plausible estimate of the profits lost as a result of defendants' retaliation. This precise issue was at the heart of the district court's justification for granting a new trial: "Here, plaintiffs made no effort to quantify the economic losses of each corporate plaintiff." Evans v. Fogarty, No. CIV-01-0252-HE, slip

48

op. at 4 (W.D. Okla. Aug. 25, 2003). We agree that while plaintiffs' evidence was sufficient for a jury to find liability for the corporate plaintiffs against Fritz and Fogarty, their offering of proof as to the corporate damages was woefully insufficient. Moreover, we agree with the district court that remittitur is inappropriate as to the corporate damages, "there being no apparent basis in the evidence for setting some lesser amount of damages." Id. at 9.

Recognizing that there have already been two trials addressing damages in this case, we nevertheless conclude with great reluctance that a third trial on damages is necessary. Given that the juries in the first and second trials reached different conclusions as to defendants' liability and as to which plaintiffs prevailed, the corporate damages awards from the second trial are not applicable to the first. See Wilson v. Burlington N. R.R. Co., 804 F.2d 607 (10th Cir. 1986) (reversing grant of new trial and reinstating first jury's verdict where second jury reached different conclusions as to liability of parties); Diamond Shamrock Corp. v. Zinke & Trumbo, Ltd., 791 F.2d 1416 (10th Cir. 1986) (reinstating first jury's verdict where prevailing parties differed). We therefore exercise our authority to order a new trial limited solely to corporate damages. See Malandris, 703 F.2d at 1168.

Plaintiffs' arguments in favor of reinstatement of the corporate damages awards are unpersuasive. They correctly identify precedent establishing that we do not demand precision in our review of a jury's award for economic damages.

49

See, e.g., <u>Bitler v. A.O. Smith Corp.</u>, 400 F.3d 1227, 1242 (10th Cir. 2004) (upholding an award for future medical expenses that was "not based on specific and substantial evidence"); <u>Fiedler v. McKea Corp.</u>, 605 F.2d 542, 547 (10th Cir. 1979) ("[M]athematical exactness is not required."). Yet McDaniel's economic loss calculation was not simply imprecise – rather, it had the air of fantasy.

We reemphasize that "[t]he purpose of § 1983 damages is to provide compensation for injuries caused by the violation of a plaintiff's legal rights. No compensatory damages may be awarded absent proof of actual injury." <u>Jolivet v. Deland</u>, 966 F.2d 573, 576 (10th Cir. 1992) (citation omitted). "Although damages for lost business opportunities need not be supported by mathematical certainty, they must be based on reasonable proof. Amounts that are speculative, remote, imaginary, or impossible of ascertainment are not recoverable." <u>Fitzgerald</u>, 68 F.3d at 1264 (quotation omitted). In order for a juror to accept McDaniel's lost profits calculation, she would have to make a series of outlandish assumptions that find little support in the record. Namely, she would have to find not merely that the disparity evidence was sufficient to show retaliation, but that it accurately represented the degree of injury to the corporate providers (i.e., that providers serviced identical patient populations and that no disparity existed prior to 1999). In addition, she would have to find that the reimbursement gap constituted pure lost profit to every corporate plaintiff – in other words, she would have to find that corporate plaintiffs did not scale back their operations at

50

all due to reduced approvals. Finally, she would have to find that the allocation between corporate providers accurately reflected the lost profits as to each.

Although there were a few bits of evidence in the record that spoke to these questions, they were not sufficient to render McDaniel's economic loss estimate anything but "speculative, remote, imaginary, or impossible of ascertainment." Id. Accordingly, a new trial is required to ascertain the appropriate measure of damages as to each corporate provider.

## V

After entering judgment following the second trial, the district court awarded attorney fees and costs to certain plaintiffs against Fogarty and Brown. All parties now appeal that award. As discussed at length supra, we have concluded that the district court abused its discretion in granting defendants' motion for a new trial, and have reinstated the verdict from the first trial as to Fritz and Fogarty. That reinstated verdict differs substantially from the judgment entered following the second trial with respect to both liability and damages. In particular, we have dismissed all claims against Brown, such that Neal and Nancy Thrift are no longer prevailing parties against her pursuant to 42 U.S.C. § 1988(b). Given these discrepancies, we conclude that reconsideration of the fee award is necessary, and that it would unduly prejudice the parties if we were to decide the fee appeals on their merits. See Williams v. Trader Publ'g Co., 218 F.3d 481, 488 (5th Cir. 2000) (vacating and remanding attorneys' fees when

51

reversal of punitive damages reduced total judgment by approximately 40 percent); Copper v. City of Fargo, 184 F.3d 994, 998 (8th Cir. 1999) (enforcing judgment rendered in first trial and remanding for determination of attorneys' fees); Bunch v. Bullard, 795 F.2d 384, 399-400 (5th Cir. 1986) (vacating and remanding when court reversed judgment as to certain prevailing plaintiffs); cf. O'Rourke v. City of Providence, 235 F.3d 713 (1st Cir. 2001) (reinstating verdict from first trial but upholding award of attorneys' fees from second trial when single plaintiff prevailed against defendant in both trials). Accordingly, we vacate the award and remand to the district court for a determination of appropriate fees in light of our partial reinstatement of the first trial verdict.

**VI**

We **REVERSE** the district court's grant of a new trial, **REINSTATE** the first trial verdict as to defendants Fritz and Fogarty, and **REMAND** for remittitur of certain individual damages awarded at the first trial as described in Part IV supra. We **REMAND** the corporate damages awards for a new trial limited solely to damages. We **REVERSE** the district court's denial of JMOL to Brown following the first trial, and **REMAND** with instructions to **DISMISS**. We also **REVERSE** the district court's award of partial fees and costs under 42 U.S.C. § 1988(b) and **REMAND** for reconsideration of the award in accordance with this

disposition.  All pending motions are **DENIED**.

ENTERED FOR THE COURT


Carlos F. Lucero
Circuit Judge